*Claude R. Branch, Edward P. Jastram, Edwards & Angell,* for petitioner.

*Tillinghast and Collins,* of counsel.

*Albert A. Baker,* City Solicitor, *Elmer S. Chace,* Assistant City Solicitor, for respondent.

---

STATE *vs.* ANTONIO MARIANO.

JULY 10, 1914.

PRESENT: Johnson, C. J., Parkhurst, Sweetland, Vincent, and Baker, JJ.

*(1) Criminal Law. Indictments. Evidence.*

Upon an indictment for manslaughter, where the testimony of one medical expert was to the effect that the condition of the body indicated that the crime of sodomy might have been committed, testimony tending to show the sexual ability of the defendant to commit such crime was irrelevant and its admission constituted reversible error.

*(2) Constitutional Privileges. Criminal Law.*

*Semble:*—Whether the admission in evidence of photographs of a defendant is a violation of his constitutional privileges is not decided, but it appears that exemption from self incrimination in the state courts is not secured by the federal constitution.

*(3) Criminal Law. Indictments. Exhibits.*

Upon an indictment for manslaughter where the manner of the killing was a matter of inference, the fractured bones of the skull, offered to demonstrate the force and effect of the blows were admissible in evidence notwithstanding the fact that defendant stated that he denied all knowledge of the homicide and would not dispute any of the evidence in that regard, the character and appearance of the exhibit not being such as to tend to prejudice the jury against the defendant.

*(4)   Criminal Law.   Indictments.   Exhibits.*

Statements and declarations by an accused, although not amounting to a
    confession, but from which in connection with other evidence and the sur-
    rounding circumstances an inference of guilt may be drawn, are admissible
    against him as admissions, but as they are in the nature of confessions they
    are subject to the same rule that they must be voluntary.

*(5)   Confessions.*

Statement to an accused "whatever you tell me I want you to tell the truth"
    did not constitute an inducement rendering the statements of accused there-
    upon made involuntary and inadmissible.

*(6)   Confessions.*

Statement to an accused by one officer "if you did it say so and I will do all I
    can for you; if you didn't do it don't say you did" did not constitute an
    inducement so as to render statements of his to another officer, involuntary.

*(7)   Confessions.*

Where an accused is taken before a magistrate, unless otherwise provided by
    statute, and whether cautioned or not, his confession is admissible in evidence
    against him, unless it was brought about by some inducement that renders
    it untrustworthy or has induced a false confession.

*(8)   Confessions.*

The action of the court in denying a motion by defendant to strike from the
    record all of the testimony in so far as it purported to give statements of
    defendant of the nature of confessions, on the ground that they were not
    voluntary, will not be disturbed where there is no sufficient reason to dis-
    agree with the conclusion of the court on conflicting evidence, and the court
    instructed the jury that they might consider all the evidence and exclude
    the confession if upon the whole evidence they were satisfied it was not
    voluntary.

*(9)   Criminal Law.   Discretion.*

Where a defendant lacked three months of 14 years of age when the crime was
    committed, and while it appeared that he was backward, he admitted he knew
    it was wrong to kill, the evidence was sufficient to make the question of
    his capability to commit crime one for the jury.

INDICTMENT.   Heard on exceptions of defendant and some
exceptions sustained and new trial granted.

BAKER, J.   This is an indictment against the defendant,
Antonio Mariano, for manslaughter in killing William A.
Mather on February 29, 1912, in North Providence, in this
State.   There are four counts in the indictment, the first two
charging the killing by means of blows upon the head with

a stone; the other two by blows upon the head "in some way and manner and by some means, instruments and weapons to the grand jurors unknown." The case was heard on the 11th, 12th, 13th, 14th, 15th, 18th and 19th days of March, 1912. At the trial the following statements showing the commission of a crime and its circumstances were in evidence and not disputed.

On February 29, 1912, Mather was twelve years and eight months old. He was a pupil in the fourth grade in the public schools at Marieville, a village in said North Providence. He attended both school sessions that day. He left his house at ten minutes before one o'clock in the afternoon and reached the school after the session had begun and was marked tardy; in consequence of being late, he was detained ten minutes after the close of the school for the day. He then went away and there is no direct evidence that he was ever afterwards seen alive. His dead body was found on the side of Moses Angell hill, near Mineral Spring Avenue, on the evening of March 27, 1912, at a place more or less covered with trees and rocks and which was to all appearances little used or frequented in winter. The skull was crushed in from about an inch back of the right ear to the middle of the occipital bone. There was a scalp wound and another fracture of the skull about the size of a half dollar on the top of the occipital bone. In addition, there were four other scalp wounds and a contused wound with a slight abrasion on the right elbow. The anus of the body was open and distended, by measurement from an inch and an eighth to an inch and a quarter. When found, the body was lying prone with the head turned so that the left side of the face was resting on the ground, leaving the right cheek exposed, with the left arm under the body and the right arm over the back. The body was frozen and in a good state of preservation, excepting that there were indications that the right side of the face had been disturbed by some animal. The body was clothed with a shirt or waist, a "singlet" or undershirt, a pair of trousers, stockings and shoes. The shirt or waist

was torn and the suspenders were down off the shoulders. His coat and sweater were found behind a V shaped rock higher up the hill and about 125 feet from where the body was found, and his cap still further up the hill about 25 feet away from said rock. There was blood on the sweater. At a distance of two feet from the head of the body when found lay a stone about 8 inches long, 5 inches wide and 1½ inches thick, tapering in nearly all directions to a sharp edge, and weighing four pounds and six ounces. A microscopical examination, verified by chemical analysis, revealed traces of human blood, several human hairs and a small piece of scalp tissue on portions of said stone.

The medical examiner, who made the autopsy, testified that the wounds upon the head might have been caused by "almost any blunt instrument" used with different degrees of force; that said stone could have been such instrument; and that the blow which crushed the skull would cause "almost instant death." The distention of the anus was explained by the medical witnesses as being due to its having been dilated either just before or just after the boy Mather's death; that the dilation was caused by penetration of the anus by some instrument or body; that it was impossible to state what actually caused the dilation and that it possibly might have resulted from the commission of the crime of sodomy.

The defendant on February 29, 1912, lacked a few months of being fourteen years of age, that is, he did not become fourteen until June 4, 1912. He had attended the public school in Marieville for a short time during the fall of 1911, but with his relatives moved into Providence for a few months, where he was a pupil in the school on Branch Avenue. Later they returned to Marieville, where, on February 29, 1912, he reëntered the public school, but in a different room and in a lower grade than the one attended by the Mather boy.

What follows sets forth in substance the material portions of the testimony connecting the defendant with the crime.

Suspicion was cast upon Mariano shortly after the finding of the dead boy's body. It appears that there had been some talk about his having bats. In answer to the request of other boys for bats, he promised to give them some. These boys were Pasco Busserio, James Amondi and Antonio Amondi. They were at the time about eleven years old each. After school at noontime he told these boys to go up the hill (where the body was afterwards found) and said that they would find some bats behind a rock. Mariano went a little way with them and then started to go home. Not finding any bats they got up on the rocks and called to him. In reply he told them to go higher up. They went higher up but could find no bats; they did find, however, behind a rock a coat, a sweater and a rubber shoe. They left the clothes, but James Amondi took the rubber away. After school that day Mariano gave to James Amondi two bats and to two other boys three bats, or five in all, which he had properly obtained from a neighbor living across the street, a Mrs. Hayden by name. The date of these occurrences is not entirely clear, but it was apparently March 27th or thereabouts. At any rate, as Walter A. Lefevbre was returning from his work on that day, he heard that boys had found some clothes up in the woods, and he started off the team, when it stopped at the bottom of the hill, and went up the hill and after some search found the clothes. Later in the evening he with two other men and William M. Mather, father of the dead boy, went to the place, found and identified the clothes and after further search found the dead body lying diagonally across an old cart path, in the condition already described. Afterwards it was learned that the defendant had tried to sell a watch to one Ricci Petrochelli, a boy of ten, who attended the same school, which watch was supposed from its description to belong to the dead boy, who had a cheap open-face watch. Thereupon, between five and six o'clock of March 30th, 1912, the defendant was taken into custody by George P. Willis, Chief of Police of North Providence, and placed in one of the cells in the basement of the town hall

at Centredale, after having been questioned several times by Mr. Willis and Domenico Conca, a special police officer, at which times the prisoner emphatically and repeatedly denied having caused the death. At about ten o'clock in the evening, however, after protesting "Honest to God Mister, I didn't kill him," he told Mr. Sanford E. Kinnicom, a deputy sheriff assigned to duty in the Attorney General's office, that on the day of the boy Mather's death, he met him playing in the road with the boys near the spring; that Mather refused to play with him because he, Mariano, had given the other boys bats but none to him; that he then said to Mather "If you want some bats you come up the hill and I will give you bats;" that they went up on the hill and upon finding no bats Mather got mad and they fought, and he put his foot on Mather's neck, but afterwards let him up, and proposed that they climb up on the rocks; that they started to climb up on the rocks, himself leading the way and Mather following; that as they were doing this his foot knocked off a piece of the rock, which hit Mather on the head who fell and lay on the ground; that Mather said nothing but breathed hard; that he kissed him and said a prayer over him and went home and cried all night; that he went back next day and found the body "just the same, his clothes all right. I knelt down side of him I say another prayer and I go home. I go back again, him all right." In answer to an inquiry as to why he sent the little boys up on the hill to look for bats, when he knew there were no bats there, he said "I want them to find him. I feel awful bad, I think of it all the time. But they no go where I tell them, I send them up there, then tell them to go up further, then I go home. They no find him, they no go where I tell them." This conversation was downstairs in the cell room, but the prisoner was not at the time in a cell. The same evening, at about eleven o'clock, upon being taken upstairs, Mariano repeated this statement in its essential features in the presence of Mr. Willis, Mr. Conca, Inspectors Wolf and Ahern of the police department of Providence, and Mr. Kinnicom, but with some additional

details. Some one asked,"What did you do with the watch?" He replied that he went back the third day and took the watch from the boy's clothes. Further asked what he had done with the watch, he said, "I hid the watch back of a stone over there on the foot of the hill." To the inquiry as to whether he could show where he hid it, he said, "Yes, side of big rock, some bushes right up side of the rock. I put it between the bushes and the rock" and said he would show where it was. The entire party thereupon went in an automobile to the hill where the body had been found. Mariano went to a rock and reached down between the bushes and the rock. He felt all around without finding any watch, and then said, "I showed that stone to my brother, he see me there one day, he knew the watch was here. I bet he came and took it. If he did, I know where he put it." As they were going back to the automobile, some one asked him if he could show where the stone fell off and hit the boy, he said he could. They went up the hill. After looking around at other rocks, he came to the one behind which the clothes were found and said, "That is the stone there." This was the V shaped rock. He also said that he tried to carry the boy home and did carry him a distance, but he was too heavy and so he left him. Said he thought he could show where he left him. He went up the hill and came back and said "kind of path." He came back down the hill till he struck the path, followed it, looking around carefully, and finally said, "Yes it was right here, he lay right this way." The place indicated was just about where the body was found. Then the party returned to the automobile and went to where Mariano lived. He said that if his brother had taken the watch he would hide it down under the stairs in the cellar of the barn, as he hid everything there. They went to the barn and made search, but found no watch. The brother was wakened and brought out but denied any knowledge of the watch. The defendant then said it was at his sister's house on Hassan street; that he had stayed there the night before and that it was under the couch, that the couch lining

was torn, and he had put it in there.  The party then went to the sister's house, but no one was at home.  After some delay she was found, brought there, and an entrance effected. The prisoner walked right over to the sofa, reached under it, and the lining was torn as he had described, but no watch was found there, and no watch was ever found.  He was then taken at three or four o'clock of the morning of March 31, to the police station on Fountain Street, Providence. On April 1st he was arraigned before Judge Rueckert, of the sixth district court, in his office.  He read the charge to the boy and asked him whether he was guilty or not guilty, and as the boy hesitated somewhat, then said to him, "These people, the police, say that you killed William Mather, now what do you say?"  To this inquiry the boy replied, "I did, but I didn't mean to."

The defendant in his testimony at the trial says that on February 29th, after the close of school, at half past three o'clock in the afternoon, he went directly to George Frazza's house, broke some wood for him in his yard, played piggy for a while and then went straight home over the fields, cleaned up the yard at the direction of his mother, and did not go out after he went home.  He denies killing young Mather, and says that he did not see him February 29th, and didn't know him; he sent the boys for bats, but explains that he had placed some bats, given him by Mrs. Hayden, in the field on his way to school, thinking the teacher would take them from him, if he brought them to school; admits trying to sell a watch to Petrochelli, but says it was a watch given him by one Frank Zabillo; admits making to Mr. Kinnecom and the other officers and to Judge Reuckert the statements related by them, but says the statements were untrue and that he made them by the direction of Domenico Conca and Anthony Capuano, who suggested the story he told as to Mather's death, and told him that by telling it he would get out and he permitted to go home; that he was frightened when in the cell and wanted to go home.  He also says that Domenico Conca put him up to telling the story about William

Mather's watch, and it was in consequence of what Conca said that he told Judge Reuckert what he did and that Conca told him all this when he was in the cell at the town hall. He also says that Conca told him that the rock he pointed out was where William Mather was killed.   George Frazza, a small school boy, says that the defendant went home with him at close of school on February 29th, and played piggy with him for half an hour, and Frank Zabillo testifies that he gave defendant a cheap watch in January, 1912.   Defendant's younger brother, Michael, also says that he saw him with Frank's watch.   The mother of Mariano says he came home February 29th "about 4.30 or 5.00, but I do not remember well," and that when he came home he worked around the yard, and his appearance and conduct after February 29th was the same as at other times.   He is described by one of his teachers as a very dull boy.   In rebuttal Conca and Capuano denied defendant's charges that they induced the defendant to make the statements he did or were in any way the author of them.   The jury found the defendant guilty with a recommendation of mercy.   Exceptions were taken to various rulings of the justice presiding at the trial in the course thereof, and the case has been heard by this court on defendant's bill of exceptions as allowed by the court below.

The bill of exceptions as filed contains thirty-five exceptions. Three of these, respectively, numbered 18, 21 and 31, were disallowed by the justice presiding at the trial, and no attempt has been made to establish their correctness before this court.   Those numbered 1, 2, 9, 24, 26, 27 and 30 have not been pressed before this court, thus leaving twenty-five for consideration.

As several of these exceptions relate to the same subject-matter, it will be convenient to group them in considering them.   The fifth, sixth, seventh, eighth, ninth, tenth, eleventh, twelfth, thirteenth, fourteenth and sixteenth exceptions all refer to the admission of testimony offered by the State tending to show that defendant had reached the age of puberty and had the sexual capacity to commit the crime of sodomy.

It was shown by the testimony that while the defendant was detained at the Sockanosset School awaiting his preliminary examination before the sixth district court he was subjected to a physical examination on April 5th and 6th, 1912, by Dr. Henry A. Jones, the resident physician at the State Institution and Dr. Clifford H. Griffin, a medical examiner for the County of Providence and the police surgeon of the city of Providence. The examination was made apparently for the express purpose of ascertaining his sexual development and capacity. While the prisoner was entirely nude four photographs were taken of him in a standing position, one a front view, one a back view, and two side views, one of each side.

The third, fifteenth and twenty-second exceptions relate to objections to the introduction of testimony respecting the physical examination and to the introduction in evidence of said photographs. The question to which the third exception lies was simply preliminary, and the allowance of the question and answer was not error and the exception is overruled.

The other thirteen exceptions just enumerated, except the fifteenth, are all based upon the offers of testimony tending to show the sexual ability of the defendant to commit the crime of sodomy. The testimony of Drs. Barnard and Griffin and of the undertaker is that the anus of the dead boy was widely open. The two doctors express the opinion that this condition was due to its having been penetrated by some instrument, either just before or just after the death of the Mather boy. This opinion as to the time of penetration is based upon said open condition of the anus, which these witnesses believe did not close after its dilation because death had destroyed the contractile power of the sphincter muscle. If these inferences as to the cause and time of said dilation are to be relied upon, it would not be unreasonable to conclude that the person who killed the boy was also the cause in some way of the dilation. Such a conclusion is doubtless the attempted justification of the offer of the evidence now

being considered.    The only suggestion in the evidence that the dilation was due to the commission of the crime of sodomy is found in the testimony of Dr. Griffin.    On page 117 of the transcript this appears:    Cross Q. 89.    "Now, doctor, you didn't find—you couldn't say whether that penetration was caused by any particular instrument, could you?"    Answer, "No sir."    On page 125 of the transcript we find.    C. Q. 136.    "You are not willing to go on record as stating that the crime of sodomy was committed on William Mather, are you?"    Answer: "No sir, I am not.    I say the condition found indicated that it might have been done.    That is as far as I can go."    C. Q. 137.    "Indications only show    .    .    . Answer:    "That it could have been done."    There was no testimony showing such a disarrangement of the dead boy's clothes, as for example, that the top of the trousers were below the hips as to give added weight to this suggestion of Dr. Griffin.    It therefore derives its whole significance from the dilated condition of the anus.    Upon this slender foundation is erected a structure of testimony, which includes the narrative as to the defendant's physical examination, the description of his physical appearance and development, and the four photographs all adduced in order to show to the jury his physical capacity to commit a crime, the actual commission of which is only suggested as a mere possibility. We think the testimony was not sufficiently relevant to the issues in the case.    Sodomy is a crime against nature, and as such is a disgusting and repulsive offence.    So that, if the person who killed William Mather did it in the endeavor to commit the crime of sodomy, or if the killing was the result, accidental or otherwise, of a personal quarrel and then, perhaps under a sudden impulse, while the stricken body of the victim was yet warm—whether before or after his death —the slayer availed himself of the opportunity to gratify his lustful passion, for this vile act, he would naturally be regarded by most men as a foul degenerate and a wicked and criminal pervert.    We think therefore that all of this evidence relative to the defendant's ability to commit the crime of

sodomy could not have failed to prejudice his case with the jury. *State* v. *Ellwood*, 17 R. I. 763, 769. It should have been excluded. The 5th, 6th, 7th, 8th, 9th, 10th, 11th, 12th, 13th, 14th, 16th and 22nd exceptions are sustained.

With the sustaining of these exceptions the fifteenth exception becomes unimportant and it is overruled.

(2) Defendant under exception twenty-two also urges that the taking of the photographs and their admission in evidence was in effect compelling the defendant to testify against himself in derogation of his constitutional rights in this particular, making specific reference to certain sections of the Federal constitution. In view of the fact that we have found that this evidence should have been excluded it is not necessary to consider this claim of constitutional privilege beyond calling attention to the case of *Twining* v. *New Jersey*, 211 U. S. 78. A part of the syllabus is: "Exemption from self incrimination in the State courts is not secured by any part of the Federal constitution," and this is upheld by the text of the opinion.

Although a new trial is to be granted for the reason stated, nevertheless a somewhat full consideration of some of the other exceptions will be of service for guidance in a future trial of the case.

The fourteenth exception was taken to the admission in evidence of a certain box and its contents which said box was marked "State's Exhibit 3." It is somewhat difficult to determine from the record whether the box was so admitted or not. This exception is noted on page 75 of the transcript, but there is no express ruling of the court to that effect. The uncertainty on this point appears to have been such that the State offered it in evidence near the close of its case, as appears on page 452 of the transcript. There was then a prolonged discussion on the point of its admissibility, but no ruling by the court is shown, as, however, the exception on page 75 is allowed and the box is marked "State's Exhibit 3," it is to be treated as having been duly admitted in evidence. The objections to its admissibility are first, that no dispute

was made by the defendant as to the nature and extent of the wounds on the skull of William Mather and second, that such evidence only tended to prejudice the jury against the defendant. Inspection shows the exhibit to contain the crown or upper and back portion of the skull with some fragments of bones. Demonstrative evidence of this character is relevant and admissible when it serves either to show the commission of a crime or throws light on the way it was committed. On the other hand, if it explains no fact and (3) is relevant to no disputed issue then it is excluded on account of its tendency to create prejudice. See Wharton Crim. Ev., Vol. 2, § 518, 518c, 941; 2 Wigmore on Evidence, § 1157; *Cole* v. *State*, 45 Texas Crim. Rep. 225, 232. In this case the manner of the killing was a matter of inference. The fractured bones served to demonstrate the destructive force and effect of the blows inflicted better than a technical verbal description and gave the jury opportunity as practical men to judge for themselves whether the injuries were likely to follow from a stone or similar weapon as described by the medical witnesses. The mere fact that the defendant announced that he would deny all knowledge of the death of Mather and therefore would not dispute any of the evidence as to the homicide itself simply left upon the State the burden of properly proving its case and did not bar it from offering any demonstrative evidence which might tend to throw light not only on the fact, but on the mode of killing. The necessity of its admission is perhaps a debatable question, but taking into consideration the character and appearance of the exhibit itself we do not under the circumstances of this case think it was clearly an error to admit the box and contents in evidence. Exception fourteen is overruled.

The seventeenth exception to the testimony of Ricci Petrochelli, in answer to question 129 in redirect examination, is not of importance. In the cross-examination of this witness, in question 114, defendant's counsel had asked him who it was that told the witness "to say that you did not want to take the watch, that Mariano wanted to give you because it was

William Mather's watch." The answer to question 129 and the questions immediately preceding show that it was the sister of the witness who so told him. The exception is overruled.

Exception twenty, to the overruling of defendant's objection to question 154 by the last witness is overruled as the answers of this witness to this and the following question could not have prejudiced the defendant.

(4) The twenty-third exception is taken to the overruling of defendant's objection to question 48 in the direct examination of Sanford E. Kinnecom, as follows: "And what was the commencement of your conversation with him?" This refers specifically to the admission in evidence of the conversation the defendant had with Mr. Kinnecom in the cell room of the town hall on the evening of March 30th, 1912, but it goes also to the admission of his statements during the night in the presence of Mr. Kinnecom. The objection to the admission of this evidence was on the ground that these statements were not voluntary.

In the examination of Mr. Kinnecom before the court in the absence of the jury for the purpose of determining the admissibility of his evidence, he said that on the evening of March 30th, 1912, he chanced to be in the vicinity of the town hall of North Providence and went in there and saw Mr. Willis, who informed him that he had a boy in custody who "gets right on the verge of telling us something and then stops. I wish you would talk with him." Thereupon Mr. Kinnecom went downstairs with officer Brown. He found there Antonio Capuano, an Italian police officer, who was talking in Italian to the defendant through the door of his cell. Mr. Kinnecom did not understand it and what this conversation was was not at that time in evidence. Capuano finally wound up in English, saying to Mariano: "If you did it say so, and I will do all I can for you. If you did not do it, don't say you did. I've got four kids myself." The reply of the boy was, "I didn't kill him so I can't say I did." Capuano then went out of the station. Mr. Kinnecom testifies that then "I walked up to the cell door and said,

'Well, little fellow, what have they got you in here for?' He made no reply. Officer Brown was going toward the door to go out and I said, 'Here, have you got a key to this cell?' He said 'Yes.' I said, 'Come back and let this boy out.' He came back and let the boy out and I looked around and found a box and a chair and I took the box and set it down side of the furnace and set the chair in front of it and said, 'Little fellow, sit down here.' He sat down on the box. I said, 'You don't know who I am, do you?' 'No, Ma'am.' 'Well,' I said, 'I am an officer, I work in the court house in the city. You know where that is?' He says, 'Providence?' I says 'yes.' 'Now,' I says, ' I am going to ask you about the Mather boy. Whatever you tell me will be used either for you or against you. Now remember, Tony, whatever you tell me, it may tell for you or it may tell against you. Be sure and understand it, it may hurt you, or it may help you, but whatever you tell me, I want you to tell the truth.'" The boy said, "Honest to God, Mister, I didn't kill him," but afterwards told the stories and made the statements hereinbefore repeated. Mr. Kinnecom also states that the boy did not appear to be frightened during the talk but was cool and calm. He seemed to be somewhat worried about something, but after making his statement acted as if relieved of a burden.

The statements made to Mr. Kinnecom by the defendant were not in strictness a confession. "A confession is a person's declaration of his agency or participation in a crime. The term is restricted to acknowledgments of guilt." *People* v. *Ammerman,* 118 Cal. 23, 32; see, also, Greenleaf on Evidence, Section 170; 6 Am. & Eng. Encyc. of Law, 521; 12 Cyc. 459. These statements by the defendant were of an explanatory and exculpatory character, admitting that he caused Mather's death by accident, but denying criminal intent or liability. Statements and declarations by an accused person, although not amounting to a confession, but from which in connection with other evidence and the surrounding circumstances an inference of guilt may be drawn, are admissible against him as admissions. 12 Cyc. 418.

The State claims that it is not necessary to show that these statements were voluntarily made. One of the best modern writers on evidence holds that exculpatory statements denying guilt cannot be treated as confessions and that in order to admit them in evidence it is not necessary to show them to be voluntary in character. 1 Wigmore on Evidence, Section 821 (2) and (3) and cases cited in notes. In the author's discussion of the subject this view is impressively stated. In practice, however, there is a great lack of uniformity in the decisions on the point, but in the greater number of jurisdictions it is held that the voluntary character of such admissions must be shown. 12 Cyc. 419. In *State* v. *Nagle*, 25 R. I. 105, this court treated similar statements or admissions having "a vital bearing upon a highly important link in the chain of circumstantial evidence relied on by the prosecution" as in the nature of confessions and subject to the same rules of admissibility in evidence, that is, that they must be voluntary. From this standpoint we will consider this and the next two exceptions.

(5) The defendant makes little real objection to the preliminary conversation and admonition given by Mr. Kinnecom. The words "but whatever you tell me I want you to tell the truth" do not constitute an inducement rendering the statements thereupon made involuntary and inadmissible. 2 Whart. Crim. Ev. § 654. This court in *State* v. *Nagle*, *supra*, said: "We do not wish to be understood in what we have thus said, however, as deciding that a mere request, advice or admonition to tell the truth will render a confession induced thereby inadmissible in evidence, for the strong current of authorities, as well as the better reason, is to the contrary. Am. & Eng. Encyc. L. 2d Ed. Vol. 6, 531, and cases cited; *State* v. *Habib*, 18 R. I. 558." The remarks of
(6) Mr. Kinnecom to the defendant did not render the defendant's statements made to him inadmissible under this rule.

Was the statement in English of Capuano to the defendant an inducement to make a false confession? If he had simply said, "If you did it, say so and I will do all I can for you,"

the promise of assistance might raise a question as to the following statements being voluntary, but the added words, "If you didn't do it, don't say you did," naturally refute any suggestion in the preceding words of a recommendation to confess.   The effect of similar expressions has been passed on by other courts.   In *Dotson* v. *State*, 88 Ala. 208, an officer told a prisoner he would help him all he could, adding, "If you did do it, it might be best for you to say so; but if you did not, stick to it that you did not."   In *Rafe* v. *State*, 20 Georgia, 62, 68, a sheriff told a prisoner if he did do it he had better acknowledge it; but if he did not do it, not to acknowledge it.   In *State* v. *Kirby*, 1 Strobh., 155, the prisoner was told that if he was really guilty and confessed who were the right persons he might be pardoned, but was admonished not to confess if he was innocent.   In none of these cases were the statements quoted held to make the confession which followed involuntary.   "Mere advice to confess if guilty, and, if not, to stand firm does not render the confession involuntary."   2 Whart. Crim. Ev. § 654,   See, also, cases in note 3 to § 832, 1 Wigmore on Evidence.   The answer of the defendant to Mr. Capuano, "I didn't kill him, so I can't say I did," shows no indication of his being influenced to confess by what Capuano had said to him. We think there is nothing in these statements to the defendant to make his subsequent statements to Mr. Kinnecom involuntary.   In the discussion before the court as to the admissibility of the testimony of Mr. Kinnecom as to his conversation with the defendant, the defendant's counsel expressed a desire to have the State then call Chief of Police Willis, Domenico Conca and Antonio Capuano for examination as to what was done and said to the defendant the evening of March 30th before Mr. Kinnecom arrived in order that he might have the privilege of cross-examining them.   No ruling was requested and none made.   The counsel did not himself offer to call the persons named or any others for examination.   These witnesses were all afterwards called by the State in the progress of the trial and they were cross-

examined. There is obviously nothing in this occurrence to lead to the exclusion of the testimony of defendant's statements. *State* v. *Jacques,* 30 R. I. 578, 585. The twenty-third exception is overruled.

(7)     The twenty-fifth exception is to the admission in evidence of defendant's statement to Judge Reuckert when arraigned. It is not necessary to consider this at length. "Where the accused is taken before a magistrate . . . unless otherwise provided by statute, and whether cautioned or not, his confession is admissible in evidence against him unless . . . such confession was brought about by some inducement that renders the confession untrustworthy or has induced a false confession." 2 Whart. Crim. Ev. p. 1279. There is no suggestion of the happening of anything at the time of arraignment to render defendant's statement inadmissible. *Wolf* v. *Commonwealth,* 30 Grattan (Va.) 833, 840; *State* v. *Washing* 36 Wash. 485. The previous consideration of the objection to the admission of the defendant's statements to Mr. Kinnecom the night of his arrest made on similar grounds renders it unnecessary to say more as to this particular exception, which is overruled.

The twenty-third exception relates to the testimony of Mr. Kinnecom only and the twenty-fifth to the testimony of Judge Reuckert.

(8)     The twenty-eighth exception was taken to the refusal of the court to strike from the record all the testimony of all the witnesses for the State in so far as such testimony purported to give statements of the defendant of the nature of confessions or admissions on the same ground, namely, that these alleged confessions or admissions were not voluntary. This exception covers not only the testimony of Judge Reuckert and Mr. Kinnecom, but also that of Inspectors Ahearn and Wolf, and large portions of the testimony of Chief of Police Willis and of Domenico Conca, although to this testimony, apart from that of Mr. Kinnecom and that of Judge Reuckert, no objection was made when it was offered. The motion to strike out was made after practically all of the

evidence in the case was in. The additional testimony pertinent to this exception relates to the happenings to the defendant, after his arrest and before the arrival of Mr. Kinnecom at the town hall, including in such happenings what was said to him or in his hearing by other persons, his surroundings when locked in the cell and how these conditions affected or influenced him. The undisputed testimony shows that he was questioned somewhat about Mather's watch while being taken to the town hall; questioned more at length as to the whole affair after his arrival there before being taken downstairs to the cell; that on being taken down he said: "Going to leave me here?" On being told "yes," he said, "Take me upstairs, I will tell you all about it." That on being taken upstairs he said, "I don't know anything about it," whereupon after a brief questioning he was locked in the cell; that he said several times in the course of these interviews that if he could go home, he would tell all about it; that he cried at times, the testimony being conflicting as to extent of this and as to whether the cell room was lighted while he was in the cell. Defendant himself tells of occurrences and remarks, which, if true, might tend to frighten him, and of his being persuaded by promises of assistance from some of the State's witnesses to make the statements he did relative to the manner of Mather's death. Upon these points the testimony was conflicting.

Upon consideration of all the testimony then in, pertinent to the question raised, the justice presiding was apparently of the opinion that on the facts found by him to exist the statements of the defendant testified to were of a voluntary character. Upon the evidence relative to this question, as to which there was no dispute, we find that the testimony objected to was properly admissible. If, and in so far, as he considered the conflicting testimony in the formation of his opinion, we find no sufficient reason for differing with his conclusion. He had the opportunity of seeing and hearing the witnesses, as we have not. Relative to the question of a confession being voluntary or not as

affected by a conflict of testimony, in *Com.* v. *Preece,* 140
Mass. 276, the court says: "When there is conflicting
testimony, the humane practice in this Commonwealth
is for the judge, if he decides that it is admissible, to instruct
the jury that they may consider all the evidence, and that
they should exclude the confession, if, upon the whole
evidence in the case, they are satisfied that it was not the
voluntary act of the defendant." See, also, *Com.* v. *Cuffee,*
108 Mass. 285, *Com.* v. *Bond,* 170 Mass. 41, and *Burton* v.
*State,* 107 Ala. 108; *Stallings* v. *Georgia,* 27 Ga. 572, 581, 583.
The record shows that the court instructed the jury in this
manner and that no exception was taken thereto. There
was no error in denying the motion to strike out and the
twenty-eighth exception is overruled.

The twenty-ninth and thirty-second exceptions were taken
to the denial of separate motions for the direction of a verdict
in favor of the defendant. In our opinion the court's action
on these motions was correct. We think a suitable case had
been presented for determination by jury and that the
evidence, if believed to be true, might properly leave no
doubt of the defendant's guilt. These exceptions are
overruled. See *Com.* v. *Williams,* 171 Mass. 461; 7 Am. &
Eng. Encyc. of Law, 863, 864.

Exception thirty-one was taken to certain remarks of the
court made while discussion was in progress as to a question
calling for testimony concerning "the character or reputation
of the defendant." While of course it is always incumbent
upon a court, and most of all in the heat of a trial when it
may be annoyed by the persistence of zealous counsel in the
face of its rulings already made, to avoid any utterance
which would prejudice a defendant with the jury, the words
objected to in this case are not such as to require comment,
inasmuch as the defendant obtains a new trial on other
grounds, and as there is small probability of the precise
situation occurring again. The exception is overruled.

The thirty-third exception was taken to the refusal of the
court to charge the jury as follows: "The State having

produced no evidence that the defendant possessed the discretion to judge between right and wrong and the evidence being clear that the defendant was dull and backward under the age of 14, you are hereby directed to bring in a verdict of not guilty." The defendant lacked three months of being fourteen years of age when the crime was committed. At fourteen the presumption of criminal incapacity would cease. Obviously with a boy of average intelligence at his age on February 29th, slight evidence might rebut that presumption. The defendant was undoubtedly a backward boy, but he said in his cross-examination that he knew it was wrong to kill another boy. We think that the evidence in this case was sufficient to make the question of his capability to commit crime one for the jury. *State* v. *McDonald*, 14 R. I. 270; see, also, *State* v. *Learnard*, 41 Vt. 585, 589; *State* v. *Guild*, 10 N. J. L. 163; 18 Am. Dec. 404, 416. This exception is overruled.

Exception thirty-four lies to the additional instructions given to the jury in response to their request after they had been out a considerable time. We have carefully read and considered these instructions. Some members of the jury seemed confused as to how they should treat the so-called confessions. Several specific questions were asked the court by different jurors. The additional instructions were given in reply. We are not prepared to say that these instructions were obnoxious to the charge of an unfair reference to and use of the testimony. They were not a complete charge in themselves, but were obviously intended to be considered together with the original instructions. This exception is overruled.

The 5th, 6th, 7th, 8th, 9th, 10th, 11th, 12th, 13th, 14th, 16th and 22nd exceptions are sustained. All the others are overruled and the case is remitted to the Superior Court for a new trial.

*Livingston Ham*, Assistant Attorney General, for State.
*Anthony V. Pettine*, for defendant.