**STATE**

v.

**Dennis J. DAMIANO.**

**No. 89–453–C.A.**

Supreme Court of Rhode Island.

Feb. 18, 1991.

James E. O'Neil, Atty. Gen., Jeffrey Greer, Asst. Atty. Gen., John J. Hogan, Sp. Asst. Atty. Gen., for plaintiff.

Richard Casparian, Public Defender, Catherine Gibran and Barbara Hurst, Asst. Public Defenders, for defendant.

## OPINION

WEISBERGER, Justice.

This case comes before us on appeal from a judgment of conviction of four counts of robbery entered in the Superior Court. We vacate the conviction and remand the case for a new trial. The facts of the case insofar as pertinent to this appeal are as follows.

On February 7, 1984, a robbery took place at a branch office of the Fleet National Bank located on Broad Street in the city of Providence. The account of eyewitnesses indicated that the robbery was perpetrated by two men just after the opening of the bank at 9 a.m. One man was black and was described as being approximately five feet eight inches in height, having a thin to medium build. He had some facial hair and wore a cap, a long coat, and sunglasses. This man was armed with a handgun and jumped over the tellers' counter and ordered the tellers to fill a bag with money. The other man was white and was described as being approximately five feet six inches in height with a stocky to heavy or rugged build. The second man wore a knit cap, a long jacket and a bandanna across the lower part of his face. The second man was armed with a shotgun and stood guard at the main entrance to the bank. Witnesses gave varying descriptions, characterizing this person as having facial hair while a number of accounts were given concerning the color of both the hair on his head and the facial hair. In the course of the robbery, Kenny Phillips, the bank's maintenance man, unexpectedly entered the bank through a back door. This

alarmed the robbers, one of whom shouted, "Watch your back," to his confederate. At this point Phillips retreated and slammed the back door shut. The first robber vaulted over the counter and ran out the front door along with the second robber, who had been standing guard. The two fled from the parking lot in a metallic blue BMW automobile driven by a third black man. The trio sped toward Roger Williams Park, but as it reached the easterly side of the park, the BMW hit a tree, backed up, hit another tree, and then stalled. The three men left the stalled automobile and ran toward the park, scattering in different directions.

A witness to the crash signaled to his neighbor to call the police. Apparently a number of police detectives who were responding to the report of the bank robbery heard a radio broadcast concerning the auto crash on Carr Street near Roger Williams Park. They then heard that a police officer was being held at gunpoint on Babcock Street. Thereupon the detectives went to Babcock Street where they saw a black male, later identified as John Hicks, holding Patrolman Castillo as a hostage. He was holding a pistol to the police officer's head and using the policeman's body as a shield. He threatened to shoot the police officer if anyone sought to fire upon him. After a period of attempted negotiations, Hicks maneuvered his hostage into an unmarked police car that was parked nearby with the engine running. As Hicks was in the act of closing the passenger door of the automobile, several officers fired upon him, striking his body with a number of bullets. Hicks was dead when the ambulance arrived, and Officer Castillo was wounded by a bullet accidently fired into his hand.

The defendant in this case was not a suspect in respect to this crime until June 1984, when Detective William Carroll of the Providence police department received a call from Patrolman Thomas Keleher and Lieutenant Lincoln of the Canton, Massachusetts, police department.

On June 25, 1984, defendant was arrested in Canton for a crime unconnected with

**398**

the Providence robbery and was in the company of his fourteen-year-old nephew, Ronnie Champagne. Ronnie was also arrested and placed in an adjacent cell. Initially Ronnie gave a false name and address. However, defendant informed the police of Ronnie's true name and address and also of the fact that he was a juvenile. Officer Keleher overheard defendant telling his nephew, "Just be quiet about what I told you the other day." As a result of this comment, Keleher and another officer interrogated Ronnie in another room and tried to find out what his uncle's comment could be interpreted to mean. This interrogation was the subject of disputed testimony. Ronnie claimed that the officer screamed at him and either punched or poked him in the chest. Eventually Ronnie informed Patrolman Keleher that in March 1984 defendant had a telephone conversation, one end of which Ronnie overheard. The person on the other end was referred to as "Birdie." When Ronnie asked defendant a few days later about the conversation, defendant replied that he had been involved in a bank robbery in Providence. He showed the boy a page from the Boston Herald that contained a photograph and an article about the robbery. The defendant pointed to the photograph and said, "That's me." The defendant further told Ronnie that he, along with two other men, had been involved in the bank robbery and that one of the men took a policeman as a hostage while defendant and the third man ran into the woods. The defendant further told Ronnie that he had spent a week in the woods and dropped his gun there. Ronnie testified that he was impressed by the story but was not sure that he believed his uncle, who might well have been joking. As a result of this statement, Officer Keleher communicated with Detective Carroll of the Providence police department.

Providence police officers took a further statement from Ronnie and eventually presented him as a witness at trial. The only evidence in addition to Ronnie's testimony that implicated defendant consisted of the matching of two latent fingerprints on the interior driver's window of the BMW getaway car to known prints of defendant.

In support of his appeal, defendant raises five issues that will be considered in the order in which they appear in defendant's brief. Additional facts will be supplied as necessary in order to form a basis for determining these issues.

I

THE INTRODUCTION INTO EVIDENCE OF THE BOSTON HERALD ARTICLE

■ The defendant argues vigorously that the Boston Herald newspaper article describing the robbery and the taking of Officer Castillo as hostage should not have been admitted into evidence since it constituted the quintessence of hearsay. With this contention we are in agreement. Rule 801(c) of the Rhode Island Rules of Evidence defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."

It is obvious that a newspaper article, if admitted into evidence as a full exhibit, fits the definition of hearsay. Indeed, it is difficult to imagine a more dramatic example of hearsay than a newspaper article written by a reporter from accounts given him by other persons and by his own observations when that reporter is not present in court and therefore not available for cross-examination. A veritable legion of cases have held that a newspaper article constitutes hearsay and is inadmissible to prove the facts asserted therein. *See generally* Annot., 55 A.L.R. 3d 663 (1974).

■ The state does not dispute the proposition that ordinarily a newspaper article would constitute hearsay. However, the state argues that this Boston Herald article is an exception to the rule of inadmissibility by reason of the fact that it was adopted as a statement by defendant and therefore qualifies as nonhearsay pursuant to Rule 801(d)(2)(B), which generally defines as nonhearsay "a statement of which [defendant] has manifested [his] adoption or belief in its truth." This rule has long been

recognized and is generally described in 4 Wigmore, *Evidence* § 1073 (Chadbourn rev. ed.1972). The gist of an admission by adoption requires that the accused party, by conduct or express statement, creates the inference that he accepts the truth of the matter asserted in a written statement prepared by a third person.

In the case at bar the only reference that the accused made to the newspaper article, according to the testimony of Ronnie Champagne, was that defendant pointed to a picture in the article and stated, "That's me." In these circumstances defendant clearly adopted the photograph that depicted him as one of the persons involved in the robbery. It might also be inferred that he adopted the headline that stated that the article related to a bank robbery. However, there is absolutely nothing in the evidence introduced by the state that could justify an inference that defendant adopted the entire narrative of the article, including the hostage-taking and subsequent events leading to the death of John Hicks. This inflammatory and prejudicial material was not adopted by defendant either specifically or by implication.

Consequently the trial justice was in error when he admitted this newspaper article in its entirety as a full exhibit for the truth of the matter asserted.

## II

### THE REQUESTED INSTRUCTION ON VOLUNTARINESS

The defendant requested the trial justice to instruct the jury concerning the testimony of Ronnie Champagne as follows:

"If it appears from the evidence in the case that a statement would not have been made, but for some threat of harm or some offer or promise of immunity from prosecution, or leniency in punishment, or other reward, such a statement should not be considered as having been voluntarily made, because of the danger that a person accused might be persuaded by the pressure of hope or fear to confess as facts things which are not true, in an effort to avoid threatened

harm or punishment, or to secure a promised reward.

"If the evidence in the case leaves the jury with a reasonable doubt as to whether a statement was voluntarily made, then the jury should disregard it entirely.

"If, on the other hand, you find that the statement in evidence was voluntarily made then you will give it such weight as you feel it deserves under the circumstances.

"The jury will always bear in mind that the law never imposes upon a defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence."

The trial justice, however, declined to give this instruction but gave a general instruction concerning credibility without adverting to the effect of the involuntariness of the statement in the event that the jury found the statement to have been the product of coercion.

█ At the outset we are of the opinion that the requested instruction was erroneous. In effect it would have peremptorily ordered the jurors to disregard the testimony of Ronnie Champagne if they had a reasonable doubt concerning whether the statement was voluntarily made. We know of no precedent from the Supreme Court of the United States that would require a jury to ignore the testimony of a live witness on the basis of having a reasonable doubt concerning whether a prior statement containing the substance of such testimony had been produced by coercion. There is, of course, ample precedent for the jury's ignoring a confession by the accused if involuntary, even though such confession has been admitted into evidence. *State v. Lima*, 546 A.2d 770 (R.I.1988); *State v. Ferola*, 518 A.2d 1339 (R.I.1986); *State v. Verlaque*, 465 A.2d 207 (R.I.1983); *State v. Killay*, 430 A.2d 418 (R.I.1981); *State v. Mariano*, 37 R.I. 168, 91 A. 21 (1914). This principle has not been applied to the live testimony of a witness by this court. It has similarly never been applied by the Supreme Court of the United States as a constitutional imperative to the testimony

of a live witness. Indeed even a defendant's confession is not required by the Court to be submitted to the jury on the issue of voluntariness. *Lego v. Twomey*, 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972).

The defendant has cited *LaFrance v. Bohlinger*, 499 F.2d 29, 34 (1st Cir.), *cert. denied*, 419 U.S. 1080, 95 S.Ct. 669, 42 L.Ed.2d 674 (1974), as enunciating the principle that a statement obtained by coercion from a witness other than the defendant may not be used to establish guilt on due-process grounds. In that case the Court of Appeals determined that a statement previously given by a witness, and used to cross-examine the witness as a prior inconsistent statement should have been the subject of an inquiry outside the hearing of the jury in order to determine whether it was admissible as a voluntary statement. The Court of Appeals inferred this requirement from the rationale of *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), when read together with *Lego v. Twomey*, *supra*. In establishing this due-process right, the First Circuit relied to a great extent upon dissenting opinions filed in *Malinski v. New York*, 324 U.S. 401, 65 S.Ct. 781, 89 L.Ed. 1029 (1945) (Rutledge, J. dissenting). *See also Bradford v. Michigan*, 394 U.S. 1022, 89 S.Ct. 1638, 23 L.Ed.2d 48 (1969) (Warren, J. dissenting from denial of cert.); *Hysler v. Florida*, 315 U.S. 411, 62 S.Ct. 688, 86 L.Ed. 932 (1942) (Black, J. dissenting).

It is unnecessary for us, however, to determine whether the First Circuit's holding in this case comports with the constitutional requirements laid down by the Supreme Court of the United States concerning standing to assert violations of the Fifth Amendment under the guise of a due-process violation because this case simply does not apply to the circumstances of the case at bar.

In *LaFrance* the First Circuit clearly conceded that under *Lego v. Twomey*, *supra*, there was no federal constitutional right to have voluntariness submitted to the jury. This issue was deferred to the Massachusetts court in the event that the District Court should find that the statement was not voluntary. Whether the Massachusetts court would submit this question to the jury was a decision that the federal court had no power to make.

In the instant case defendant did not challenge the admissibility of the testimony of Ronnie Champagne; therefore, that question was never presented to the court. He then sought by this instruction to require the jury to disregard the testimony if it had a *reasonable doubt* concerning voluntariness. No decision of this court would support such an instruction, and we specifically reject it here. We believe that this jury should have been instructed, as it was, concerning credibility of testimony. It should also have been instructed to take into account the voluntariness or involuntariness of such testimony in determining the weight, if any, to be given to such testimony. If the jurors found that the testimony was produced by coercion, then they had a right to disbelieve it or reject it. It was certainly not the burden of the state to prove beyond a reasonable doubt to the jurors that the testimony was voluntary.

The trial justice therefore committed no error in declining to give the requested instruction. We have discussed this issue at some length in order to furnish guidance to the trial justice who may preside over a new trial.

III

THE PRIOR CONSISTENT
STATEMENT

■ The defendant argues that the trial justice erred in admitting the testimony of Patrolman Keleher insofar as said testimony included the substance of the statement made to him by Ronnie Champagne concerning defendant's admissions to Champagne. The trial justice, after a hearing outside the presence of the jury, admitted Keleher's recounting of the statement as a prior consistent statement pursuant to Rule 801(d)(1)(B). Prior to the adoption of our current rules of evidence, which are based upon the federal rules, a prior consistent statement could be introduced not

for the proof of the matter asserted but to rehabilitate the credibility of a witness whose veracity had been attacked by a suggestion of recent fabrication. *See, e.g., State v. Ouimette,* 110 R.I. 747, 760–61, 298 A.2d 124, 133 (1972); *McCormick's Handbook of the Law of Evidence* § 251 at 601–04 (2d ed. Cleary 1972); 4 Wigmore, *Evidence* at § 1129. The adoption of our counterpart of the Federal Rules of Evidence changed the effect of a prior consistent statement by defining such a statement as not hearsay and therefore admissible for the proof of the matter asserted if "offered to rebut an express or implied charge against [a witness] of recent fabrication or improper influence or motive."

This rule must be considered in conjunction with a somewhat analogous though contrary rule that Rhode Island has developed to prohibit the bolstering of a witnesses' statement through repetition by a police officer. *State v. Brash,* 512 A.2d 1375 (R.I.1986). The opinion in *Brash* generally follows the theory set forth in Wigmore at § 1124 that absent impeachment, repetition of a witness's testimony is neither valuable nor helpful and should ordinarily be rejected. In the case at bar, however, the testimony of Officer Keleher, including the repetition of Champagne's statement to him, took place after crossexamination and thus did not imply recent fabrication but did lay a foundation for a claim of coercion or lack of voluntariness. Consequently the trial justice distinguished this situation from *Brash.*

■ However, both the state and the trial justice overlooked the general rule that a prior consistent statement, if offered to rebut the inference of bias, interest, or corruption, should have taken place at a time prior to the existence of the circumstances relied upon to discredit the credibility of the witness's testimony. 4 Wigmore, *Evidence* at § 1128. This general rule has been applied in interpretation of Fed.R. Evid. 801(d)(1)(B) by a majority of the federal courts that have considered the issue. The state in its brief concedes this point, citing *United States v. Piva,* 870 F.2d 753, 759 n. 4 (1st Cir.1989); *United States v.*

*Henderson,* 717 F.2d 135 (4th Cir.1983), cert. denied, 465 U.S. 1009, 104 S.Ct. 1006, 79 L.Ed.2d 238 (1984); *United States v. Rohrer,* 708 F. 2d 429 (9th Cir.1983); *United States v. Quinto,* 582 F.2d 224 (2d Cir. 1978); *see Annot.* 47 A.L.R. Fed. 639, 655–57 (1980). This majority view adopted by federal courts has also been recognized by the majority of state courts whose jurisdictions have adopted rules of evidence modeled upon the Federal Rules. *See Annot.* 58 A.L.R. 4th 1014, 1054–62 (1987).

Although there is both federal and state authority to the contrary, we are of the opinion that the majority rule espoused by both federal and state courts is persuasive, particularly in the circumstances of the case at bar. Allowing repetition of the witness's testimony by the very officer who was accused of producing the statement by coercion would do little to dispel the alleged improper motive leading to the original testimonial utterance. We do not suggest that it was improper for Officer Keleher to testify that he did not utilize any coercive tactics to cause Champagne to give the statement initially. This was certainly an appropriate response to the impeaching cross-examination. However, to allow Officer Keleher to repeat the statement made by Champagne to him as a prior consistent utterance would come within the sphere of bolstering condemned by *Brash* and be of little use in dispelling the claim of coercion. This repetition did not qualify as a prior consistent statement because it did not antedate the encounter alleged to have improperly produced the original statement.

The state cites *United States v. Piva, supra,* in support of its argument that defendant did not alert the trial justice of the precise ground for his objection and that, therefore, defendant did not present sufficient specificity to preserve the issue for appellate review. *See* R.I. R. Evid. 103(a).

We might well have been persuaded by this argument. However, in light of the fact that the case must be remanded for a new trial based upon our conclusion in response to the admission of the newspaper article (considered in part I of this opinion)

we believe that it will be of more guidance to the trial justice in the event of a new trial, that this issue be considered and disposed of on its merits. Consequently we hold that the admission of the alleged prior consistent statement was not warranted under Rule 801(d)(1)(B).

■ We also reject the suggestion that Patrolman Keleher's testimony did not constitute hearsay because it explained his subsequent conduct in contacting the Providence police. We have dealt with this type of situation in *State v. Braxter*, 568 A.2d 311, 315 (R.I.1990), wherein we admonished:

> "To avoid the prejudicial impact of this type of hearsay testimony, it is necessary to limit police testimony to the fact that they 'received information' that led them to be where they were at a particular time. Testimony by an officer that recounts the substance of a conversation * * * concerning a crime by the accused is not within the officer's personal knowledge and violates the hearsay rule."

This admonition seems particularly apt in this case. It was unnecessary to repeat the statement by Ronnie Champagne in order to explain the reason for Keleher's contact with the Providence police. Such repetition was unnecessary and constituted at best overkill. It was not admissible for such a purpose.

## IV AND V

### THE MOTION TO PASS AND THE MAGNIFYING GLASS

■ In response to issues IV and V in which defendant complains that the trial justice erred in denying defendant's motion to pass the case and that the trial justice erred in allowing the jury to use a magnifying glass during their deliberations, we are of the opinion that neither issue has merit. The fact that the trial justice sustained the objection to Detective Gerstmeyer's proposed experiment and struck it with a cautionary instruction to the jury was an adequate response to testimony that was inadmissible pursuant to *State v. Walters*, 551 A.2d 15 (R.I.1988).

■ The furnishing of a magnifying glass to jurors in order for them better to discern small print that might be encountered in an exhibit could scarcely be considered prejudicial error. It is the function of the jury not only to view exhibits with the naked eye but, if needed, also to utilize such technological assistance including a magnifying glass that may be within the resources of the trial justice to provide.

These two issues are of no assistance to the defendant.

For the reasons stated, the appeal of the defendant is sustained in part and denied in part. The papers in the case may be remanded to the Superior Court for a new trial.