**STATE**

v.

**Ronald BARKMEYER.**

No. 2006–279–C.A.

Supreme Court of Rhode Island.

June 20, 2008.

Virginia McGinn, Providence, for Plaintiff.

Paula Rosin, Providence, for Defendant.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

Justice GOLDBERG, for the Court.

While bathing her eight-year-old daughter, Jane,[1] on May 22, 2004, Jennifer Barkmeyer (Jennifer) noticed blood in the child's underwear. When the bleeding continued, Jennifer called her daughter's pediatrician for an appointment. On May 25, 2004, the pediatrician examined Jane and found bruising in her vaginal area. Suspecting sexual abuse, the pediatrician instructed Jennifer to take her daughter to Hasbro Children's Hospital for further examination. The pediatrician also notified

---

1. To protect the privacy of the child victim in this case, we have given her a fictitious name.

the Department of Children, Youth and Families (DCYF) about his suspicion that Jane had been molested. When Jennifer called the defendant Ronald Barkmeyer (Barkmeyer or defendant)—her husband and Jane's stepfather—to tell him about the pediatrician's findings, he immediately remarked, "they're going to suspect [me]".[2]

The DCYF assigned Laurie Houle (Houle), a child-protective investigator, to interview Jane and the family. Because Jennifer was late for her appointment with her, Houle called the Barkmeyer residence and happened to speak with defendant. Houle was surprised to hear from defendant that he needed to stop at Jane's school "to get documentation of [Jane] falling off of some monkey bar type apparatus before coming to the hospital."

When the family finally arrived at the hospital, Houle spoke with defendant and Jane about the injuries. The defendant told Houle that he had been watching Jane on May 22 and that Jane had complained of some pain and an inability to go to the bathroom. After he instructed Jane to push when she went to the bathroom, he noticed bleeding coming from her vaginal area. The defendant volunteered that he had not harmed Jane in any way, even though Houle had not asked him whether he was responsible for Jane's injuries.

Doctor Amy Goldberg (Dr. Goldberg), an expert in forensic pediatrics, examined Jane at the hospital on May 25, 2004. During the examination, Jane indicated to Dr. Goldberg that she had been touched in her "pee-pee" with a finger. Doctor Goldberg noticed severe injury to Jane's genitals, including a tear and hole-type wound, which "appeared to be quite deep."

Because of the severity of the injury, Dr. Goldberg consulted with pediatric surgeons, who performed surgery the next day to repair the damage.

Detective William Swierk (Det.Swierk), of the Middletown Police Department, was notified of the suspected sexual molestation and was told that the child victim had been referred to Hasbro Children's Hospital. The detective went to the hospital and talked with Jane, Jennifer, and Dr. Goldberg about the incident and injuries. The record reveals that, in her interview with the detective, Jane disclosed that during the assault she had been tied up with a rope.[3]

The defendant subsequently was arrested and charged with one count of first-degree child molestation sexual assault, in violation of G.L.1956 §§ 11–37–8.1 and 11–37–8.2. He was held without bail. Jennifer's father, William Wilson (William), and his wife, Barbara, came to Rhode Island from California and stayed in the family home. Both William and Barbara assisted Jennifer and Jane throughout their ordeal; that assistance included cleaning the home and packing up defendant's belongings to move them to the Marine barracks.

On June 1, 2004, several days after defendant was arrested, Det. Swierk met with William, at the latter's request, to update him on the criminal case and because, in the course of cleaning out defendant's vehicle, William had found certain items that he wished to turn over to the police. William also invited Det. Swierk to come to the home to retrieve a rope that William said he had found while cleaning the closet in the master bedroom. Before trial, defendant moved to suppress the

**2.** At that time, defendant was a mechanic in the United States Marine Corps, and the family resided in Navy housing in Middletown.

**3.** The incident also was investigated by criminal investigators from the United States Navy.

rope on Fourth Amendment grounds, but the trial justice denied his motion.

At trial, Jane testified that, when she was at home watching television, defendant, who was naked, picked her up and brought her to the master bedroom. She said that defendant then tied her hands and feet with a rope and touched her on her "private spot" with his finger. Jane further testified that, after defendant untied her, she "took a bath to take the blood away." She said that defendant warned her not to tell anybody about the incident.

Additionally, Houle testified that during her conversation with Jane, the child pointed to defendant and said that he had caused her injuries while her mother was at work. The trial justice admitted this statement over defendant's objection that it was inadmissible hearsay. Doctor Goldberg testified that, in her opinion, Jane had suffered a penetrating trauma to her genitalia by some object that was "relatively hard and straight." Doctor Goldberg also testified that Jane's injury was "one of the most severe injuries that [she] had seen[,]" and she rejected the suggestion that such an injury could be suffered from falling off monkey bars.

A jury convicted defendant of first-degree child molestation sexual assault. After his motion for a new trial was denied, as were the remaining post-verdict motions, defendant was sentenced to fifty years at the Adult Correctional Institutions, with thirty to serve and the rest suspended, with probation.[4] The defendant timely appealed to this Court, arguing that the trial justice erred when he: (1) denied defendant's motion to suppress the rope, (2) ordered the courtroom partially closed during Jane's testimony, (3)

allowed Houle to testify that Jane identified defendant as her assailant, and (4) denied defendant's motion to pass the case based on allegedly prejudicial comments made during the state's closing argument. For the reasons set forth in this opinion, we affirm the judgment. Additional facts will be discussed as required.

## I

### Search and Seizure

Before trial, defendant moved to suppress the rope, arguing that it was the fruit of an unlawful search and seizure, in violation of the Fourth Amendment to the United States Constitution.[5] Both William and Det. Swierk testified for the state. The defendant did not call any witnesses.

In urging the trial justice to suppress the rope, defendant argued that although it may have been discovered as a result of a private search, the police seized the rope without a warrant. According to defendant, the police seized the rope "after they were told where it was by a private party" and that this amounts to a warrantless seizure. It was defendant's contention that William could not consent to a police search of the home and that defendant's prior consent to search was no longer valid. Before this Court, defendant also argues that William could not give valid consent to search the home because he did not have the common authority necessary to consent to a search.

The state argued that William gave valid consent to permit Det. Swierk to enter the home so that the detective could retrieve what William previously had uncovered during a private search. According to the

---

4. Ronald Barkmeyer also was ordered to have no contact with the victim, engage in the sex-offender program, register as a sex offender, and pay certain assessments.

5. The defendant moved to suppress only on Fourth Amendment grounds; he did not argue that suppression was required under art. 1, sec. 6, of the Rhode Island Constitution.

**992**

prosecutor, the rope had been discovered "by a private citizen and pointed out to the detective when he was invited into the home."

After an evidentiary hearing, the trial justice issued a bench decision in which he denied the motion to suppress.[6] He found that the Fourth Amendment was not implicated in this case because the rope was discovered in William's private search of defendant's bedroom and closet. The trial justice concluded that there was "not a bit of evidence that suggests that any of the searching activity was carried on as a result of governmental or police authority or request." With respect to Det. Swierk's seizure of the rope in the master bedroom, the trial justice concluded that Det. Swierk was present in the home with Jennifer's consent.

Before this Court, defendant contends that the trial justice committed reversible error when he denied his motion to suppress. He argues that his prior written pre-arrest consent to search was not valid—an issue that is not before us—and also that William had no actual or apparent authority to consent to a search of the Barkmeyer home. Additionally, defendant contends that the state failed to prove that Jennifer consented to the search. The defendant argues that the admission of the rope into evidence at trial was erroneous and that this error was not harmless. Finally, defendant contends that the inevitable-discovery doctrine should not apply in this case because the police bypassed the Fourth Amendment's warrant requirement.

The state, on the other hand, argues that the rope was discovered during a private search of defendant's bedroom closet by Jennifer's father, who had assumed many duties in the household and had taken on the responsibility of contacting the police. According to the state, the rope was seized with Jennifer's consent because after the detective was invited into the home by her father, Jennifer was there, Det. Swierk and Jennifer exchanged pleasantries, and Jennifer was informed that they were going into the bedroom so that William could show the detective something. Jennifer did not object, nor did she ask the detective to leave. Alternatively, the state contends that, even if we conclude that the seizure of the rope was tainted, the exclusionary rule should not apply to the facts in this case because the rope would have been handed over to the police in accordance with the inevitable-discovery rule. *See Nix v. Williams*, 467 U.S. 431, 444, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984). Finally, the state raises the harmless-error rule.

In passing on the motion to suppress, the trial justice was confronted with several items of evidence: the rope that was seized from the closet and the handcuffs and other items of personal property that William found in defendant's vehicle. The trial justice found that the rope and the items from the vehicle were discovered during a private search and that the police did not expand that search. *See generally State v. von Bulow*, 475 A.2d 995 (R.I. 1984) (police may not expand a private search consistent with the Fourth Amendment).

With respect to the seizure of the rope, the trial justice found that Det. Swierk did not need a warrant because he was on the premises with the consent of the family, including Jennifer's consent. The trial

---

**6.** Unfortunately, this decision does not contain detailed findings of fact or conclusions of law with respect to what the trial justice described as "unique" factual circumstances.

Although we regret the paucity of findings by the trial justice, we agree with his characterization that the facts in this case are "unique."

justice found that William was a family member who was living on the premises, assisting his daughter and cleaning out the apartment and that therefore his discovery of the rope was the result of a private search to which the Fourth Amendment does not apply. Additionally, he concluded that, although William invited Det. Swierk to the home, Jennifer was present; the men explained the reason for the visit and proceeded to the bedroom with her knowledge and consent. The trial justice declared, "I believe the police officer was clearly on the premises with the family's consent, the consent of Jennifer, * * * and I do not find any necessity for a warrant under these rather unique circumstances."

Because we are mindful that the rope was seized in defendant's home—based on Jennifer's consent, as found by the trial justice, or otherwise admissible because of other exigencies, according to the state— we shall set forth in detail the testimony about the events leading up to the police's seizure of it.

It is undisputed that, before he was arrested, defendant consented to a search of his home.[7] On May 27, 2004, Det. Swierk and Agents James Lennon and Scott Hibbert, of the Naval Criminal Investigative Services (NCIS), searched the home for nearly two hours. They seized bloody clothing and a towel and face cloth, which also appeared to have blood on them, as well as a booklet entitled *Japanese Rope Bondage*. Although the men looked for the rope that defendant allegedly used to tie Jane while he assaulted her, they did not find it. Detective Swierk testified that the NCIS agents spent more time in the bedroom. He described the house as "very unkept [*sic*] and extremely cluttered." Although NCIS Agent Scott Hibbert testified that he conducted a dili-

gent search of the closet area when looking for the rope, he also described the room as cluttered and the home, including the closet, as "[a]n absolute mess."

After defendant's arrest, Jennifer called William and Barbara, and they traveled from their home in California to Rhode Island to stay with her. They arrived in Rhode Island on May 28, 2004, and helped Jennifer "do everything." William testified that, during their stay at the Barkmeyer home, they drove defendant's vehicle and helped Jennifer in every way— they drove Jennifer and Jane to their appointments and met "with everybody, as many people as [they] could." They cleaned and organized the apartment and loaded all of defendant's belongings into bags to "take [them] down to the marine barracks to get [them] out of the house." In addition to divesting the home of defendant's belongings, William stated that he was trying to locate a source of support for his daughter and Jane.

Shortly after his arrival, William called Det. Swierk and introduced himself; he informed the detective that he was in Rhode Island, living with his daughter, and that he wanted an update on the criminal case. Although William testified that Det. Swierk "was going to come over and discuss whatever evidence they had or whatever," it does not appear from the record that this happened. Detective Swierk testified that William contacted him and told him that "he was in the area to lend support" to his daughter and that William planned on calling to request "a status on the case." He asked the detective to "guide him through, basically, the procedures as to what was going to happen from the arrest on through."

---

7. The state appropriately does not contend that defendant's prior consent to search re-

mained in effect to authorize the seizure of the rope in this case.

On June 1, 2004, while cleaning defendant's car, William found several letters addressed to defendant along with a pamphlet and a pair of handcuffs.[8] He called Det. Swierk, told him that he had found items that might be relevant to his investigation, and requested a meeting. Detective Swierk and William met at a nearby coffee shop, and William handed the detective a bag containing these items.

The record discloses that William testified that, as he was continuing in his efforts to pack up defendant's belongings, he found the rope on a shelf in the upper right-hand corner of the closet. William knew that it was alleged that defendant had used a rope while molesting the granddaughter. He testified that he left the rope where he found it and called Det. Swierk and asked him to come to the house. When the detective arrived, William showed him where the rope was, and the detective took it and "put it under his coat so that Jennifer and [Jane] couldn't see it." William was firm in his testimony that he was neither directed nor requested by anyone in law enforcement to search for the rope or any other evidence. This statement was corroborated by Det. Swierk.

Detective Swierk's testimony diverges somewhat from that of William with respect to when William told him about the rope. According to the detective, this conversation occurred during their meeting at the coffee shop when William asked Det. Swierk to accompany him to the home so that he could show him what he had found. Detective Swierk testified that he returned to the apartment, walked in with William and Barbara, and encountered Jennifer, who was sitting in the living room with Jane.

Detective Swierk testified that he believed Jennifer invited him into the home; they knocked on the door and walked into the home and encountered Jennifer "right there in the living room."[9] Based on these events, Det. Swierk agreed with defense counsel that, at that point, "there was no need to ask anyone's permission to enter [the home]." Detective Swierk testified that William directed him to the closet and pointed to where he had left the rope behind a bag; the detective also testified that he moved the bag, seized the rope, and discretely placed it under his coat so Jane would not see it. Detective Swierk testified that he may have exchanged pleasantries with Jennifer and Jane on his way out of the house.

The issues that confront this Court are: (1) whether the Fourth Amendment was implicated in circumstances in which the rope was found during a private search but later seized by the police with the homeowner's consent, as found by the trial justice; and (2) even if the seizure violated defendant's privacy interest, would the rope have been found under the inevitable-discovery rule? Because we discern no error in the denial of the motion to suppress this evidence, we need not reach the

8. After finding that the items discovered in defendant's vehicle were the result of a private search, the trial justice denied the motion to suppress. However, the state did not use this evidence at trial, and the legitimacy of said discovery is not before us.

9. Specifically, when asked, "[w]ho invited you in?" Det. Swierk responded, "I believe Jennifer and [Jane] were still there. At that time they were home." Although this answer may not be a model of clarity, it sufficiently establishes that Det. Swierk was not operating under the reasonable, but mistaken, belief that William was a cotenant with apparent authority to consent to his entry. Thus, we reject the state's contention that the search was conducted under apparent authority. *See infra,* section I, D.

harmless-error argument presented by the state.

## Analysis

■ "In reviewing the trial justice's denial of defendant's motion to suppress the incriminating * * * evidence, we defer to the factual findings of the trial justice, applying a 'clearly erroneous' standard." *State v. Apalakis*, 797 A.2d 440, 443 (R.I. 2002) (quoting *State v. Page*, 709 A.2d 1042, 1044 (R.I.1998)). "With respect to questions of law and mixed questions of law and fact involving constitutional issues, however, this Court engages in a *de novo* review in accordance with *Ornelas v. United States*, 517 U.S. 690[, 116 S.Ct. 1657, 134 L.Ed.2d 911] * * * (1996)." *Apalakis*, 797 A.2d at 443.

■ When called upon to review a trial justice's denial of a motion to suppress on Fourth Amendment grounds, our task is to review the record to determine, based on the totality of the circumstances, whether the evidence sought to be suppressed was obtained in violation of the constitutional prohibition against warrantless searches and seizures. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) (determining that "the question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances"). A factual finding of voluntary consent—not based on an incorrect legal standard—is accorded deference and is disturbed only if it is clearly erroneous. *United States v. Laine*, 270 F.3d 71, 74 (1st Cir.2001). The United States Court of Appeals for the First Circuit has held that "[t]he operative inquiry is whether the evidence presented at the suppression hearing fairly supports the court's finding with respect to voluntary consent." *United States v. Romain*, 393 F.3d 63, 69 (1st Cir.2004) (citing *Laine*, 270 F.3d at 75). Our task therefore is to determine whether, based on the totality of the circumstances, the trial court's findings of a private search followed by a consensual seizure "derive adequate support from the record." *Id.* at 70.

### A

### Private Search

We note at the outset that if, after he found the rope, William had handed it to Det. Swierk in the same manner as he furnished the handcuffs and other evidence he found, the only issue before us would be the legitimacy of the private search, concerning which issue the Fourth Amendment would not be implicated. *See United States v. Jacobsen*, 466 U.S. 109, 113–14, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984) (noting that the Fourth Amendment's protection against unreasonable searches or seizures "is wholly inapplicable 'to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government or with the participation or knowledge of any governmental official' ") (quoting *Walter v. United States*, 447 U.S. 649, 662, 100 S.Ct. 2395, 65 L.Ed.2d 410 (1980) (Blackmun, J., dissenting)).

■ However, when deciding whether to admit the fruits of a private search, it is incumbent upon the trial court to determine whether the law enforcement agency's involvement "was not a significant expansion of the prior private search." *von Bulow*, 475 A.2d at 1015; *see also Jacobsen*, 466 U.S. at 115, 104 S.Ct. 1652 ("The additional invasions of respondents' privacy by the Government agent must be tested by the degree to which they exceeded the scope of the private search."). Clearly, the issue before us is not whether there

was an expansion of a private search. We are satisfied that the rope was discovered during a private search, to which the Fourth Amendment has no application. *See State v. Pailon*, 590 A.2d 858, 861 (R.I.1991) (The Fourth Amendment is not implicated when one's privacy is violated by someone other than a member of law enforcement.).

The record confirms that William told Det. Swierk (either in person or on the telephone) that he had found the rope in the closet, and he invited the detective to the home with the express purpose of turning the rope over to him. William showed the detective where he found the rope, and Det. Swierk then seized it. Detective Swierk did not search or rummage around in the closet, nor did he expand the search in any way. He had been advised that the rope was in the closet, exactly where William left it after discovering it. Further, William discovered the rope on his own, without any suggestion or encouragement from the police. Thus, we are satisfied that the rope was found during a private search.

■ Nevertheless, Det. Swierk entered the home, upon invitation, went to the master bedroom, and seized the rope without a warrant. Property is seized within the meaning of the Fourth Amendment "when there is some meaningful interference with an individual's possessory interests in that property." *Jacobsen*, 466 U.S. at 113, 104 S.Ct. 1652. The manner in which the rope was seized requires analysis beyond the law of private search. The trial justice found that the officer was in the home with the consent of the homeowner. We agree.

## B

### Consent

■ The Fourth Amendment prohibits a warrantless entry into a person's home to perfect an arrest or perform a search.[10] *Illinois v. Rodriguez*, 497 U.S. 177, 181, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990). This constitutional guarantee, however, is subject "to a few specifically established and well-delineated exceptions[,]" one of which is consent. *Schneckloth*, 412 U.S. at 219, 93 S.Ct. 2041 (quoting *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)). The Fourth Amendment prohibition against the warrantless entry into a person's home does not apply "to situations in which voluntary consent has been obtained, either from the individual whose property is searched * * * or from a third party who possesses common authority over the premises * * *." *Rodriguez*, 497 U.S. at 181, 110 S.Ct. 2793. The consent of an occupant "who possesses common authority over premises or effects is valid as against the absent, nonconsenting person with whom that authority is shared." *United States v. Matlock*, 415 U.S. 164, 170, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974). Common authority sufficient to support a valid third-party consent rests "on mutual use of the property by persons generally having joint access or control for most purposes * * *." *Id.* at 171 n. 7, 94 S.Ct. 988. The law recognizes that, because a co-inhabitant may consent to a police search in his or her own right, the remaining occupants "have assumed the risk that one of their number might permit the common area to be searched." *Id.*

---

**10.** The Fourth Amendment to the United States Constitution provides as follows:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures,

shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

 "The burden of establishing common authority and the effectiveness of a third party's consent rests upon the state." *State v. Linde,* 876 A.2d 1115, 1125 (R.I.2005) (citing *Rodriguez,* 497 U.S. at 181, 110 S.Ct. 2793). At a suppression hearing, the state bears the burden of establishing valid consent "by a fair preponderance of the evidence." *State v. O'Dell,* 576 A.2d 425, 427 (R.I.1990). This Court consistently has declared that "[t]he doctrine that recognizes the validity of third party consent to a search must be applied cautiously to prevent erosion of Fourth Amendment protections." *State v. Farrell,* 443 A.2d 438, 442 (R.I.1982).

 Our review of the findings in this case leads us to conclude, based on the totality of the circumstances, that after the rope was found in the course of a private search, Det. Swierk seized the rope while he was in the bedroom at William's invitation and Jennifer's consent. The record establishes that, at his daughter's request, William assumed a significant role in the household; although it was William who invited Det. Swierk into the Barkmeyer residence, both men encountered Jennifer immediately upon entering and while still in the common area of the home. Notably, Jennifer was told that they were going into the bedroom to see something that William had found, and she neither inquired nor objected. Based on these facts, the trial justice concluded that Det. Swierk had Jennifer's consent to enter and search the bedroom; the record supports this conclusion. Significantly, there is no evidence to

the contrary, nor is there any suggestion in this record that Jennifer did not consent to, or lacked the authority to consent to, Det. Swierk's search of her bedroom. Because the officer was in the home and in the bedroom with Jennifer's consent, he had the authority to seize any item of criminality.[11]

 The rope was an instrumentality of the crime that Det. Swierk had probable cause to seize. *See State v. Pratt,* 641 A.2d 732, 738 (R.I.1994) (When an officer who is lawfully in a position to see evidence immediately recognizes it to be evidence of criminality, he or she is entitled to seize it.). Probable cause to seize evidence in this case requires a reasonable belief that certain items are contraband or evidence of a crime. *Id.*

Finally, even if there was a violation of the Fourth Amendment in this case (and we do not conclude that there was), the inevitable-discovery rule is an insurmountable barrier to the application of the exclusionary rule.

## C

### Inevitable Discovery

 Because we approach this issue being acutely aware of the fact of William's prior discovery of certain items in defendant's car and the fact that he personally presented those items to Det. Swierk, we are of the opinion that the rope would have been delivered to the police in substantially the same manner as the handcuffs and other items were delivered.

---

11. We emphasize the highly unique combination of factual circumstances with which we are confronted in this case: Jennifer's father, who had been serving actively as sort of a designated liaison between the family and police, entered the home in the company of Det. Swierk, and their destination within the home was announced to Jennifer; her silence in this context could have led a reasonable po-

lice officer to infer that there was consent—which happened here. *See generally United States v. Patten,* 183 F.3d 1190 (10th Cir. 1999). We explicitly indicate, however, that our holding with respect to this factual scenario should not be understood as being an "Open Sesame" to predicating a finding of consent upon silence.

We therefore conclude that the rope is admissible under the inevitable-discovery exception to the exclusionary rule. *See Nix,* 467 U.S. at 444, 104 S.Ct. 2501.[12]

This Court previously has recognized inevitable discovery in various contexts. *See State v. Firth,* 708 A.2d 526, 528–29 (R.I. 1998) (A fingerprint comparison linking the defendant to the murder victim's vehicle that was based on fingerprints derived from his unlawful arrest was not subject to exclusion under the exclusionary rule because the police had an additional set of the defendant's fingerprints that were obtained by lawful means. Because the evidence that linked the defendant to the crime scene inevitably would have been discovered without reference to the illegal arrest, it was admissible.); *see also State v. Trepanier,* 600 A.2d 1311, 1318–19 (R.I. 1991) (Even if the defendant's spontaneous admission to a police officer about the location of a weapon, after he requested counsel, violated his Fifth Amendment rights as set forth in *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), the crime weapon was admissible as an item that inevitably would have been discovered regardless of the illegally obtained confession.).

 Thus, in the context of both the Fourth and Fifth Amendments, this Court has recognized that evidence derived from sources separate from a constitutional violation need not be suppressed under the exclusionary rule. The question as to whether the inevitable-discovery exception is available arises after there has been a determination that the accused's constitutional rights have been violated. When the evidence sought to be suppressed "would inevitably have been dis-

covered without reference to the police error or misconduct, there is no nexus sufficient to provide a taint and the evidence is admissible." *Firth,* 708 A.2d at 529 (quoting *Nix,* 467 U.S. at 448, 104 S.Ct. 2501). It is a rule based upon reason: "exclusion of evidence that would inevitably have been discovered would * * * put the government in a worse position, because the police would have obtained that evidence if no misconduct had taken place." *Nix,* 467 U.S. at 444, 104 S.Ct. 2501.

 The inevitable-discovery exception to the exclusionary rule is rooted in the prophylactic purposes that underlie the rule—"to deter law enforcement officers from violating a defendant's rights." *United States v. Almeida,* 434 F.3d 25, 28 (1st Cir.2006). It is a judicial recognition that, if the state establishes by a preponderance of the evidence that the challenged evidence ultimately or inevitably would have been discovered by some other lawful fashion, "then the deterrence rationale [of the exclusionary rule] has so little basis that the evidence should be received." *Nix,* 467 U.S. at 444, 104 S.Ct. 2501. Because suppression of relevant and incriminating evidence "will often have the effect of allowing criminals to go unpunished, it is justified only as a means of deterring the police from violating constitutional and statutory rights." *United States v. Silvestri,* 787 F.2d 736, 740 (1st Cir.1986). The evidence may have been obtained illegally, but the inevitable-discovery exception permits it to be admitted upon a showing that the evidence would have been discovered legally had the legal means not been aborted because of the illegal seizure. *State v. Cobb,* 251 Conn.

---

**12.** This Court may affirm a decision "on grounds other than those relied on by the trial justice." *Shepard v. Harleysville Worcester Insurance Co.,* 944 A.2d 167, 170 (R.I.2008)

(citing *State v. Nordstrom,* 529 A.2d 107, 111 (R.I.1987) and *State v. Ibbison,* 448 A.2d 728, 733 (R.I.1982)).

285, 743 A.2d 1, 39 (1999) (citing *State v. Vivo*, 241 Conn. 665, 697 A.2d 1130, 1134 (1997)).

▮ In seeking this safe harbor, the state "may not rely on speculation but rather must meet this burden of proof based on 'demonstrated historical facts capable of ready verification or impeachment.'" *United States v. Ford*, 22 F.3d 374, 377 (1st Cir.1994) (quoting *Nix*, 467 U.S. at 445 n. 5, 104 S.Ct. 2501). The trial justice must be satisfied that the seizure of the evidence must be independent of the taint, and "it must be inevitable as well." *Silvestri*, 787 F.2d at 740.

▮ Because police searches, seizures, and arrests present a universe of factual situations often affected by the overarching need for police security, the inevitable-discovery exception is applied on a case-by-case basis.[13] The First Circuit Court of Appeals has adopted a flexible analysis, in which the prosecution's invocation of the inevitable-discovery exception is evaluated. "Under this flexible standard, independence and inevitability remain the cornerstones of the analysis." *Ford*, 22 F.3d at 377. However, the requirements needed to prove independence and inevitability are determined by the specific facts in a given case. *Id.*

Turning to the case before us, the trial justice was satisfied that the rope was discovered during a private search, without any law enforcement involvement. Based on the record, we are of the opinion that the rope would have been turned over to the police inevitably, in substantially the same manner as the handcuffs and other items were handed over, wholly independent of any constitutional violation.

In reaching this conclusion, the fact that William delivered to Det. Swierk the handcuffs and other items he found in defendant's vehicle supplies us with a solid historical factual basis, beyond mere speculation, such that we need not wonder what might have happened. This dynamic provides support for our conclusion that the police inevitably would have obtained the rope, notwithstanding Det. Swierk's entry into the bedroom where he seized it. The evidence in this record satisfies us that the rope would have been delivered to Det. Swierk in substantially the same manner as the other items.

Accordingly, we are of the opinion that the inevitable-discovery exception applies in this case. To hold otherwise would place the state in a worse position than it would have been in absent any alleged police misconduct, *Nix*, 467 U.S. at 443–44, 104 S.Ct. 2501, and fail to serve the deterrent purposes of the exclusionary rule. Notwithstanding our holding that the rope was discovered during a private search and then lawfully seized with the consent of the homeowner, we nevertheless are persuaded that, in the alternative, the inevitable-discovery exception is an insurmountable barrier to exclusion of the evidence.

### D

### Apparent Authority

▮ Based on our conclusion that no Fourth Amendment violation occurred in the context of this case, it is unnecessary to address the state's contention that William was a cotenant with the apparent authority to consent to a search of defendant's bedroom. We pause to note, however, that the linchpin of apparent au-

---

**13.** The inevitable-discovery exception frequently arises in the context of a warrantless arrest or search, in circumstances in which the police are in the process of obtaining a warrant or subsequently do so, with or without reference to the police misconduct. However, its application is not limited to warrantless circumstances.

thority is evidence that the police officer entered and/or searched the premises under the reasonable, but mistaken, belief that the person consenting to such entry and/or search had the actual authority to do so. *Rodriguez*, 497 U.S. at 186, 110 S.Ct. 2793. Because there is no evidence to support this contention, the state cannot meet this evidentiary hurdle. Notwithstanding the lack of evidence, Det. Swierk's actual knowledge of William's status as a guest in the home renders unreasonable any purported belief that William was a cotenant who could consent to a search of defendant's master bedroom.

Notably, Det. Swierk did not testify that William consented to a search of the bedroom, nor is there any evidence that the detective was operating under the mistaken belief that William was authorized to do so. Moreover, because Det. Swierk had actual knowledge of the facts in this case—that William did not live at the home and merely was a visitor—apparent authority is unavailing. We are of the opinion that, even if Det. Swierk had testified that he believed William was cloaked with the apparent authority to consent to a search, that belief would not be reasonable because he had actual knowledge of William's true status in the household. Caselaw teaches us that the question of apparent authority arises when there is evidence that the officer reasonably believes he has obtained consent from a person who is authorized to permit his or her entry or allow a search of the premises and it is discovered later that the consenting party lacked the authority to do so. *See United States v. Meada*, 408 F.3d 14, 21–22 (1st Cir.2005). A third-party's consent, whether valid or invalid, is the starting point.

▄▄▄ "The authority which justifies the third-party consent * * * *rests* * * * *on mutual use* of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others *have assumed the risk that one of their number might permit the common area to be searched." *Matlock*, 415 U.S. at 171 n. 7, 94 S.Ct. 988 (emphases added). In passing on the question of apparent authority, "[w]hat matters is whether, *based on the information in the officers' possession*, they reasonably believed" that the consenting individual had the authority to consent to a search. *Meada*, 408 F.3d at 22 (emphasis added).

There is no evidence that Det. Swierk relied upon William's apparent authority to consent to a search of defendant's bedroom, but even if he did so, "based on the information in the officer['s] possession," *id.*, such a belief would not be reasonable as a matter of law.

▄▄▄ For the apparent-authority doctrine to apply, the officer reasonably, but erroneously, must believe that the person who consents to the entry has the authority to do so. *Rodriguez*, 497 U.S. at 186, 110 S.Ct. 2793. The standard for deciding the reasonableness of an officer's belief is an objective one—that is, would the facts *known to the officer* satisfy a person of reasonable caution "that the consenting party had authority over the premises?" *Id.* at 188, 110 S.Ct. 2793 (citing *Terry v. Ohio*, 392 U.S. 1, 21–22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). Based on the facts known to Det. Swierk, no reasonable person would have believed that William was a cotenant authorized to give a valid third-party consent to a search of defendant's bedroom closet. *See Rodriguez*, 497 U.S. at 186, 110 S.Ct. 2793.

Accordingly, we reject the state's contention that the doctrine of apparent authority applies in this case—based on the

dearth of evidence to support this argument and our conclusion that even if Det. Swierk believed that William was authorized to provide a valid third-party consent, such a belief would not pass the reasonableness test as set forth in *Rodriguez*, 497 U.S. at 186, 110 S.Ct. 2793.

## II

### Courtroom Closure

▉ Before Jane testified at trial, the state moved for a partial closure of the courtroom, purportedly under G.L.1956 § 12–28–8 and G.L.1956 § 11–37–13.2, arguing that closing the courtroom was necessary, given Jane's age, the nature of the allegations, and the subject of the expected testimony. In a ruling devoid of appropriate findings, the trial justice indicated that he was prepared to allow the motion. The trial justice declared that he would "close the courtroom to unnecessary personnel," but that court staff, defense counsel, a member of the victim's family, and the media would not be excluded. Notably, it was only upon prompting by the trial justice that defendant proffered a bare objection, stating, "I would object to it, Your Honor." The trial justice then stated:

"I've reviewed various materials presented. It appears as though we not only have a young, traumatized alleged victim, but she has some, what I consider to be, learning disabilities or slow maturation, and so it appears to me that her psychological or mental age may be substantially less than her actual age, and so I think that is even more reason that she deserves some additional consideration." [14]

On appeal, defendant argues that this ruling violated his Sixth Amendment right to a public trial. The state argues that the trial justice's decision was not erroneous in light of Jane's age, the nature of the allegation, and her expected testimony. According to the state, the trial justice's decision ordering a partial closure of the courtroom was appropriate because § 11–37–13.2(a) provides that "there shall be a rebuttable presumption that the child is unable to testify before the court without suffering unreasonable and unnecessary mental or emotional harm." [15] This argument is without merit.

---

14. There is no suggestion on the record before us that Jane was incompetent to testify or that she did not appreciate the oath to tell the truth. *See State v. Marr*, 673 A.2d 452, 453 (R.I.1996) (stating that "a child may not testify unless and until the trial justice has been satisfied that the proposed witness can (1) observe, (2) recollect, (3) communicate (a capacity to understand questions and to furnish intelligent answers), and (4) appreciate the necessity of telling the truth") (quoting *State v. Girouard*, 561 A.2d 882, 886 (R.I.1989)).

15. General Laws 1956 § 11–37–13.2(a) provides:

"**Alternative methods of victim testimony—Child victim.**—(a) In any judicial proceeding in which a person has been charged with sexual assault of a child who at the time of trial is seventeen (17) years of age or less, the court may order, upon a showing that the child is unable to testify before

the court without suffering unreasonable and unnecessary mental or emotional harm, that the testimony of the child be taken in a room other than the courtroom and either be recorded for later showing before the court and/or the finder of fact in the proceeding or be broadcast simultaneously by closed circuit television to the court and/or finder of fact in the proceeding. When the child is fourteen (14) years of age or younger at the time of trial, there shall be a rebuttable presumption that the child is unable to testify before the court without suffering unreasonable and unnecessary mental or emotional harm. Only the judge, attorneys for the parties, persons necessary to operate the recording or broadcasting equipment, and any person whose presence would contribute to the welfare and well-being of the child may be present in the room with the child during his or her testimony. Examination and

We are of the opinion that the state had no basis whatsoever to point to § 11–37–13.2(a), in seeking an order to close the courtroom. This statute sets forth alternate means for relieving child rape victims from the trauma associated with facing their alleged abusers in a courtroom; however, closing the courtroom is not among them. The statute wholly does not apply to this case because Jane testified at trial—not outside the courtroom, as provided for by § 11–37–13.2(a). Although this statute reflects the Legislature's effort to establish procedures for the protection of child victims, it does not anticipate that a trial justice summarily will exclude the public from attending the trial. After all, it is the defendant who is accused and whose right to a public trial is guaranteed by the Sixth Amendment to the United States Constitution.

The Supreme Court has recognized the wisdom of protecting children who are witnesses under difficult circumstances. *See Globe Newspaper Co. v. Superior Court for Norfolk,* 457 U.S. 596, 607, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982) ("[S]afeguarding the physical and psychological well-being of a minor * * * is a compelling [interest]."). Additionally, the General Assembly has enacted legislation that provides for statutory protections for children—both victims and those who allegedly are delinquent. *See, e.g., Providence Journal Co. v. Rodgers,* 711 A.2d 1131 (R.I.1998) (court records that concern the identity of victims of child molestation sexual assault shall be confidential in accordance with § 11–37–8.5); *see also Matter of Falstaff Brewing Corp. Re: Narragansett Brewery Fire,* 637 A.2d 1047, 1051–52 (R.I.1994) (the Legislature has endeavored "to afford juveniles the opportunity to enter adulthood free of

the stigmatization that follows criminal offenders") and G.L.1956 § 14–1–30 (mandating that in the Family Court, "[a]ll cases involving children shall be heard separately and apart from the trial of cases against adults").

After careful review of the record in this case, we are of the opinion that the trial justice did not deprive defendant of his Sixth Amendment right to a public trial. It is significant that defendant, upon prompting by the trial justice, mouthed a barebones objection to the closure of the courtroom (whereby "unnecessary personnel" were to be excluded), but failed to articulate a legal basis for his objection. Furthermore, and fatal to defendant's Sixth Amendment challenge, there has been no showing that anyone, whether court personnel or the citizenry, was, in fact, excluded from this portion of the trial.

This Court reviews *de novo* a party's allegation that a constitutional right has been infringed. *State v. Keohane,* 814 A.2d 327, 329 (R.I.2003). When undertaking such a review, the court *"should take care * * * to review findings of historical fact only for clear error and to give due weight to inferences drawn from those facts * * *." Powers v. State,* 734 A.2d 508, 514 (R.I.1999) (quoting *Ornelas,* 517 U.S. at 699, 116 S.Ct. 1657). After reviewing the record in this case, we conclude that defendant was not denied a public trial in violation of the Sixth Amendment to the United States Constitution, despite the trial justice's failure to articulate appropriate findings to support his ruling.

This Court has declined to hold a trial justice's closure to constitute reversible error when the record does not establish that anyone actually was excluded

cross-examination shall proceed in the same manner as permitted at the trial or

hearing."

from the courtroom. *See State v. Fayerweather,* 540 A.2d 353, 354 (R.I.1988) (holding that the trial justice's courtroom closure, even if inappropriate, did not prejudice defendant because the closure did not totally exclude the public and there was nothing in the record to "suggest that a significant number of individuals attended the trial or wished to attend or were unable to gain admittance to the courtroom when the six-year-old was about to testify"); *see also State v. Lerner,* 112 R.I. 62, 91, 308 A.2d 324, 342 (1973) (dismissing defendant's contention that he was denied his right to a public trial because "[w]hile it [was] suggested that the public would be excluded from the trial, nothing in the record establishe[d] that the public actually was excluded"). The trial justice's limited ruling to close the courtroom to "unnecessary personnel," standing alone, does not establish that the public was excluded. Absent a showing that a member of the public was prevented from attending the trial, we are unable to conclude that defendant's Sixth Amendment right was violated.

■ However, the record before us is woefully inadequate and does not support the ruling that the trial justice made. He should have conducted a hearing and made specific findings to justify his decision—merely referring to materials that he reviewed *in camera* and that are not part of the record is insufficient as a matter of law. The Supreme Court has held that, in seeking to exclude the public from a trial, the moving party must articulate an overriding interest and then a trial court must make "findings specific enough that a reviewing court can determine whether the closure order was properly entered." *Press–Enterprise Co. v. Superior Court of Riverside County,* 464 U.S. 501, 510, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984). It is clear that such specific findings were not made in this instance.

■ Further, defense counsel did little to avoid this error when he failed to offer a specific objection to the state's motion and did not suggest any options. After a trial justice proposes to close the courtroom, it is the opposing party's obligation to offer a specific, not perfunctory, objection to the closure. *See Bell v. Jarvis,* 236 F.3d 149, 169 (4th Cir.2000); *Ayala v. Speckard,* 131 F.3d 62, 71 (2d Cir. 1997); *see also Brown v. Kuhlmann,* 142 F.3d 529, 541–42 & n. 6 (2d Cir.1998) (partially attributing the trial justice's mistake in closing the courtroom to the opposing party's lack of effective advocacy). In *State v. Torres,* 844 A.2d 155, 159 (R.I. 2004), defense counsel made a record showing that members of the public and defendant's family were excluded by the trial justice during jury selection. We deemed this showing specific and granted a new trial. *Id.* at 162. In the case before us, there is no evidence that anyone was barred from the courtroom. The trial justice's order to exclude "unnecessary personnel," without more, does not establish that defendant was denied a public trial.

■ Notwithstanding our holding in this case, however, we pause to note that the state's reliance on § 11–37–13.2, as support for its motion for the closure of the courtroom, was misplaced. Before this Court, the state suggests, *inter alia,* that the trial justice's decision to close the courtroom was appropriate because § 11–37–13.2(a) provides that "there shall be a rebuttable presumption that the child is unable to testify before the court without suffering unreasonable and unnecessary mental or emotional harm." Additionally, the state points to § 12–28–8(c) as support for excluding the public from our courtrooms. Section 12–28–8(c) provides in pertinent part:

"Child victims of felony offenses, or offenses which would be considered felony offenses if committed by adults, shall have the following rights in addition to those set forth elsewhere in this chapter:

" * * *

"(4) To be permitted to testify at all judicial proceedings in the manner which will be least traumatic to the child, consistent with the rights of the defendant[.]"

We do not read these enactments as allowing trial justices to bar the public from attending a criminal trial. In an appropriate case, with an established record, we will not hesitate to order a new trial. *See Torres*, 844 A.2d at 162 (The exclusion of the defendant's family during jury empanelment deprived him of his Sixth Amendment right to a public trial. The conviction was vacated and a new trial ordered.).

Accordingly, for the reasons stated, we reject defendant's argument that his Sixth Amendment right to a public trial was violated.

## III

### DCYF Investigator Testimony

#### A

#### Relevant Facts

On May 25, 2004, Houle was called to Hasbro Children's Hospital as soon as the suspicion of child molestation arose with respect to Jane. At the hospital, Houle interviewed Jane and discussed with her the events surrounding her allegation of abuse. During this conversation with Houle, Jane not only described her injuries but also named defendant as the perpetrator.

At trial, Houle testified and recounted her conversation with Jane. The defendant objected to that portion of Houle's testimony in which Jane revealed that defendant was the assailant. He contended that her out-of-court statement was inadmissible hearsay. The prosecution maintained that the statement was not hearsay because it was offered to rebut defense counsel's suggestion during cross-examination that Jane's testimony improperly had been influenced by the state during preparation for trial.

During defense counsel's earlier cross-examination of Jane, defense counsel elicited from Jane that she met with the prosecution "to go over and practice what [she was] going to say in court" and implied that the state suggested the answers she would give about what happened. Defense counsel also questioned Jane about her fantasizing and making up stories during her counseling sessions.

Over defendant's objection, the trial justice permitted Houle to testify that Jane named defendant as the perpetrator.[16] The trial justice found that the statement was admissible: (1) under the medical-diagnosis-and-treatment-hearsay exception, R.I.R.Evid. 803(4); (2) as an identification of an assailant, R.I.R.Evid. 801(d)(1)(C); and (3) as a prior consistent statement, Rule 801(d)(1)(B), to rebut an implied charge of improper influence.

On appeal, defendant argues that the trial justice committed reversible error by admitting this testimony. Specifically, defendant asserts that the statement was not admissible under the medical-diagnosis-and-treatment-hearsay exception because the statement was made to a social worker and was not for the purpose of medical diagnosis or treatment; he also argues

**16.** The trial justice initially sustained defendant's objection; however, he eventually overruled it and admitted the testimony.

that it was not admissible as a statement of identification because identification was not an issue in the case, nor as a prior consistent statement because he contends the statement was given *after* the suggestion of fabrication. The state contends that the testimony properly was admitted as a prior consistent statement because Jane's conversation with Houle predated her discussions with the prosecution and the police.

## B

### Standard of Review

■ It is well settled that "[t]he admissibility of evidence is a question addressed to the sound discretion of the trial justice and will not be disturbed on appeal absent a clear abuse of that discretion." *State v. Lynch*, 854 A.2d 1022, 1031 (R.I.2004) (quoting *State v. Momplaisir*, 815 A.2d 65, 72 (R.I.2003)). "We give considerable latitude to a trial justice's rulings made during examination of witnesses at trial." *State v. Gomez*, 848 A.2d 221, 237 (R.I. 2004). We will not consider such rulings to be reversible error unless we find that the trial justice abused his or her discretion and thereby prejudiced the defendant such that a new trial is required. *State v. Hallenbeck*, 878 A.2d 992, 1015 (R.I.2005).

## C

### Analysis

■ Although we are convinced that Houle's testimony was not admissible under the medical-diagnosis-and-treatment-hearsay exception or as a statement of identification, we nevertheless hold that

the trial justice did not abuse his discretion in admitting Houle's testimony as a prior consistent statement. Rule 801(d)(1)[17] provides that a statement is not hearsay if:

"The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is (A) inconsistent with the declarant's testimony, or (B) consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive, or (C) one of identification of a person made after perceiving the declarant[.]"

We have held that prior consistent statements may be admitted only if they were made before the alleged influence or motive to fabricate arose. *See State v. Kholi*, 672 A.2d 429, 438 (R.I.1996) (determining that the stepdaughter's statements to a school counselor were admissible as prior consistent statements because they were made before allegations about her improper motives); *but see State v. Damiano*, 587 A.2d 396, 401–02 (R.I.1991) (concluding that the police officer's statement did not qualify as a prior consistent statement because it did not precede the encounter alleged to have improperly produced the original statement).

Here, we are satisfied that the trial justice did not err when he found that defendant's cross-examination of Jane suggested the potential for improper influence in preparation for trial. The record discloses that defense counsel both directly and indirectly implied that Jane was coached by

**17.** Before the Rules of Evidence were adopted, "a prior consistent statement could be introduced not for the proof of the matter asserted but to rehabilitate the credibility of a witness whose veracity had been attacked by a suggestion of recent fabrication." *State v.* *Damiano*, 587 A.2d 396, 400–01 (R.I.1991). Our adoption of the current rules of evidence "changed the effect of a prior consistent statement by defining such a statement as not hearsay * * *." *Id.* at 401.

the prosecution and the police. Because it is undisputed that Jane's statements to Houle preceded her meetings with the prosecution and police, the trial justice correctly ruled that the statement came within the purview of Rule 801(d)(1)(B) and was, therefore, admissible.

Furthermore, the record before us amply demonstrates that the defense in this case centered on Jane's unreliability—that she was a "suggestible child," who made up stories in counseling and whose testimony had been rehearsed and coached. We are satisfied that the defense's case rested on the fact that Jane had been coached or influenced and that these efforts led to her naming defendant as her assailant. On appeal, defendant asserts that his defense was not that of improper influence, but rather that Jane's testimony was rehearsed and therefore not believable. We reject this argument. The record discloses that defense counsel explicitly argued to the jury that Jane's testimony was the result of improper suggestion by the prosecutors, the police, and her counselors. Clearly, her statement to Houle predated any opportunity for coaching or suggestion by the state and rebutted defendant's unequivocal contention that Jane's testimony was unreliable and not worthy of belief.

## IV

### Prosecution's Closing Argument

#### A

#### Relevant Facts

In its closing argument, the prosecution characterized defendant as a "predator" who "preys on weak people." In its summation, the prosecution also said: "Throughout this trial, Mr. McCormick has done his job as the defendant's defense attorney. He has asked questions and made arguments all in the hope of distract-ing you from the truth in this matter." The defendant immediately objected after this last statement, but the trial justice overruled his objection.

At the conclusion of the prosecutor's closing argument, defendant objected to the "predator" statements made about defendant and he requested a mistrial. After characterizing the statements about defendant as "unfortunate," the trial justice gave the following instructions to the jury:

"Ladies and gentlemen, I do wish to give you another cautionary instruction. As I've said so many times and I'm going to say at least one more time this afternoon, closing argument is not evidence. It cannot be considered by you as evidence and is required, if proper, to be based upon the evidence. Unfortunately, the prosecutor just made a statement to the effect that the accused is a predator and preys on weak people. That was highly improper, and it has nothing to do with this case. There is nothing to suggest that any allegation whatsoever exists other than a single charge that is before you. So, I direct you to disregard that comment. I'm sure it wasn't intentional, but any argument has to be based upon the facts and the facts only."

On appeal, defendant contends that the trial justice erred when he denied his motion for a mistrial because the statements made about him could not in any way be neutralized by the trial justice's cautionary instructions to the jury. The state argues that the trial justice did not abuse his discretion in denying defendant's motion because (1) defendant did not preserve his objection to the statements made about defense counsel for appeal, and (2) any prejudice flowing from the statements about defendant's alleged predatory nature effectively was counteracted by the trial justice's cautionary instructions.

## B

### Standard of Review

 "It is well settled that a decision to pass a case and declare a mistrial are matters left to the sound discretion of the trial justice." *State v. Suero*, 721 A.2d 426, 429 (R.I.1998) (citing *State v. Figueroa*, 673 A.2d 1084, 1091 (R.I.1996)). The trial justice has a "front row seat" during the trial so that he can best evaluate the effects of any prejudice on the jury. *State v. Tempest*, 651 A.2d 1198, 1207 (R.I.1995). "The ruling of the trial justice * * * is accorded great weight and will not be disturbed on appeal unless clearly wrong." *State v. Mello*, 472 A.2d 302, 304 (R.I. 1984).

 "A prosecutor is given considerable latitude in closing argument, as long as the statements pertain only to the evidence presented and represent reasonable inferences from the record." *State v. Boillard*, 789 A.2d 881, 885 (R.I.2002). There is no fixed rule of law to determine whether a challenged remark is incurably prejudicial, but instead, the trial justice must assess the probable effect of the remark within the factual context of the evidence presented. *State v. Lane*, 609 A.2d 633, 636 (R.I.1992); *State v. Ware*, 524 A.2d 1110, 1112 (R.I.1987); *State v. Collazo*, 446 A.2d 1006, 1010 (R.I.1982).

 If the trial justice provides a cautionary instruction to the jury, this Court must assume that the jury has complied with it unless some indication exists that the jury was unable to comply with the instruction. *State v. Powers*, 566 A.2d 1298, 1304 (R.I.1989). However, no cautionary instructions can cure a remark that the trial justice has deemed, within its factual context, "so inflames the passions

of the jury as to prevent [its] calm and dispassionate examination of the evidence." *State v. Brown*, 522 A.2d 208, 211 (R.I. 1987).

## C

### Analysis

 We begin by stating that the prosecution's characterization of defendant as a predator was inappropriate. We take this opportunity to reiterate our condemnation of *ad hominem* attacks that solely "serve to demonize a particular defendant." *State v. Horton*, 871 A.2d 959, 965 (R.I. 2005). However, we are not convinced that the trial justice clearly erred when he found that this statement, although inflammatory, could be cured by an appropriate cautionary instruction. *See id.* at 966 (holding that the trial justice's failure to rule on the defendant's objection and the prosecution's characterization of the defendant as a "monster" did not rise beyond the level of harmless error). In our opinion, any prejudice to defendant that would have flowed from the prosecution's inappropriate remarks was cured by the comprehensive cautionary instruction by the trial justice, which was timely, appropriate, and a model of clarity.

Furthermore, assuming without deciding that the defendant's objection concerning the statements made about defense counsel was properly preserved for appeal, we hold that the trial justice was not clearly wrong in declining to pass the case.[18] We fail to see how this remark was improper or prejudicial in the context of this case, and we are of the opinion that the trial justice was within his considerable authority to overrule the defendant's objection.

---

18. However, we do not approve of the prosecution's suggestion that defense counsel intentionally was misleading the jury.

These comments were well within the "considerable latitude" afforded to prosecutors who bear a heavy burden of proof in a criminal case, *Boillard,* 789 A.2d at 885, and did not disparage counsel or prejudice the defendant in any way.

## Conclusion

For the reasons set forth in this opinion, the judgment of the Superior Court is affirmed. The papers in this case may be returned to the Superior Court.

Justice FLAHERTY, dissenting and concurring in part.

I write separately with regard to sections I and II of the majority's opinion. With respect to the search and seizure, I concur with the majority's holding that there was no Fourth–Amendment violation; however, I respectfully dissent from its reasoning. As to the closure of the courtroom, I respectfully, but completely disagree, with the majority. Because I believe a reversible constitutional error was committed when the trial justice ordered the partial closure of the courtroom, I would vacate the judgment of conviction and order a new trial for the defendant.

## I. Search and Seizure

### A. Consent

I cannot agree with the majority that Jennifer Barkmeyer consented to Det. Swierk's warrantless entry into her home and his subsequent seizure of the rope from the closet in the bedroom she shared with defendant. Given the constitutional implications of warrantless searches, courts have required that consent be "unequivocal, specific, intelligently given and

uncontaminated by duress or coercion." *Robinson v. State,* 578 P.2d 141, 144 (Alaska 1978); *State v. Brown,* 836 S.W.2d 530, 547 (Tenn.1992) (citing *Liming v. State,* 220 Tenn. 371, 417 S.W.2d 769, 770 (1967)). Consent to search may be either express or implied by the encompassing circumstances. *See United States v. Jaras,* 86 F.3d 383, 390 (5th Cir.1996). Various courts have refused to find implied consent when a suspect remained silent, absent the presence of any accompanying gestures.[19] *See id.* at 390; *United States v. Shaibu,* 920 F.2d 1423, 1427 (9th Cir.1990).

In contrast, courts have found implied consent when one who is silent provides any one of a variety of cues to police that suggest consent. *See United States v. Walls,* 225 F.3d 858, 862–63 (7th Cir.2000) (finding consent when one of the defendants opened the door and stepped back to allow the police to enter); *United States v. Gordon,* 173 F.3d 761, 766 (10th Cir.1999) (the defendant did not respond verbally to the police's request to open the bag in question, but removed the key to the bag from his pocket and handed it to the police); *Commonwealth v. Voisine,* 414 Mass. 772, 610 N.E.2d 926, 932 (1993) (the defendant pointed in the direction of the bedroom); *see also United States v. Impink,* 728 F.2d 1228, 1233 n. 3 (9th Cir. 1984) ("In most implied consent cases, the suspect himself takes some action that implies consent—he gestures to the police to enter, * * * or assists in the search of others. In those cases, we have found that consent was 'unequivocal and specific.'"). When an implied-consent finding is based on nonverbal gestures, such manifestations of consent must go beyond mere acquies-

19. It should be noted, however, that various courts have held that a suspect's silence, in response to the police's explicit request for consent, can be used to infer consent. *See, e.g., United States v. Gordon,* 173 F.3d 761, 766 (10th Cir.1999) (holding that the defendant consented when he failed to object to a search of his locked bag after an officer asked him to open the bag).

cence and cooperation. *See United States v. Albrektsen*, 151 F.3d 951, 955 (9th Cir. 1998) (holding that the defendant's moving aside when the police entered his motel room did not amount to implied consent).

Here, the record does not demonstrate that Jennifer expressly consented to Det. Swierk's entry into her home or to his subsequent seizure of the rope from the bedroom.[20] However, the majority seems to justify the detective's actions based on Jennifer's failure to object both when the detective entered her home and when she was told that the detective and her father were going into her bedroom. Because Jennifer's silence was not accompanied by *any* nonverbal intimation demonstrating consent, I fail to see how her consent can be inferred. In my opinion, and with full appreciation of the majority's view in this difficult case, inferring consent by Jennifer is conjecture that exceeds the scope of any recognized exception to the Fourth Amendment, and I decline to do so.

### B. Inevitable Discovery

I also disagree with the majority's rationale that the inevitable-discovery doctrine would prevent the application of the exclusionary rule to the present case. Under the inevitable-discovery doctrine, "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means * * * then * * * the evidence should be received." *Nix v. Williams*, 467 U.S. 431, 444, 104

S.Ct. 2501, 81 L.Ed.2d 377 (1984). The prosecution may not rely on speculation, but rather must meet this burden of proof based on "demonstrated historical facts capable of ready verification or impeachment." *Id.* at 445 n. 5, 104 S.Ct. 2501.

To be sure, an exact definition of "inevitability" is difficult. *See United States v. Cabassa*, 62 F.3d 470, 474 (2d Cir.1995). However, some courts have defined the threshold as a "very high degree of probability that the evidence in question would have been obtained independently of the tainted source." *People v. Payton*, 45 N.Y.2d 300, 408 N.Y.S.2d 395, 380 N.E.2d 224, 231 (1978); *see United States v. Rogers*, 102 F.3d 641, 646 (1st Cir.1996). One commentator has noted:

"The significance of the word 'would' cannot be overemphasized. It is not enough to show that the evidence 'might' or 'could' have been otherwise obtained. Once the illegal act is shown to have been in fact the sole effective cause of the discovery of certain evidence, such evidence is inadmissible unless the prosecution severs the causal connection by an affirmative showing that it *would* have acquired the evidence in any event." 6 Wayne R. LaFave, *Search and Seizure, A Treatise on the Fourth Amendment*, § 11.4(a) at 276 (4th ed.2004) (quoting Robert F. Maguire, *How to Unpoison the Fruit—The Fourth Amendment and the Exclusion-*

---

**20.** Detective Swierk testified on cross-examination to the following sequence of events:
"Q. Now, when you went back to the house with Mr. Wilson, were you invited into the house?
"A. Yes.
"Q. Who invited you in?
"A. I believe Jennifer and [Jane] were still there. At that time they were home.
"Q. Did you have a conversation with Jennifer about coming into the house?

"A. I—just knocking on the door and saying—we did not get into specifics as to what we were there for. I think [William] told [Jane] that grandpa needs to show the detective something."
I do not believe this testimony suggests that "Jennifer invited [the detective] into the home," as the majority asserts. Rather, I read the testimony as showing only that Jennifer was in the house when the detective entered.

*ary Rule*, 55 J.Crim.L., Criminology & Police Sci., 307, 315 (1964)).

In other words, likely discovery is not inevitable discovery.

Courts have applied the doctrine when investigative procedures already were in progress before evidence was discovered by illegal means. *See Nix*, 467 U.S. at 449–50, 104 S.Ct. 2501 (holding that the murder victim's body would have been discovered even without the defendant's illegally obtained statements, when the search for it had been underway and a grid system showed that the area in question would have been searched soon); *State v. Trepanier*, 600 A.2d 1311, 1318–19 (R.I. 1991) (holding that the evidence would have been discovered because the police had been searching in the exact area where the evidence later was found). Courts also have applied the doctrine when, pursuant to some standardized police procedure or established routine, a certain evidence-revealing event definitely would have occurred later. *See State v. Firth*, 708 A.2d 526, 529 (R.I.1998) (holding that fingerprints from the crime scene would have been matched to the defendant because his fingerprints already were on file and the police would have checked that database as part of routine procedure); *see also United States v. Almeida*, 434 F.3d 25, 29 (1st Cir.2006) (holding that the drugs would have been found in the police's routine search of the defendant after he legally was arrested).

In my opinion, the present matter is distinguishable from these limited categories of cases—no independent search was underway here and no search would have occurred as a matter of routine police procedure. The majority is persuaded that the seized rope inevitably would have been discovered by the police because William would have delivered it to the police had they refused to come and seize it themselves. The majority bases this presumption on the fact that William once before had delivered items he found in defendant's vehicle to Det. Swierk. In my opinion, such a presumption is nothing more than "mere speculation," *State v. Licari*, 659 N.W.2d 243, 261 (Minn.2003), that goes well beyond the present scope of the doctrine of inevitable discovery. Although William "might have" delivered the rope to the police, even if he was likely to do so, it cannot be said that he inevitably "would have" done so based on a single previous incident.

## C. Apparent Authority

Nevertheless, I believe that the exclusionary rule should not be applied here because Det. Swierk, under any objective standard, reasonably believed that William had the authority to consent to the detective's entry into the Barkmeyer home and to the seizure of the rope, irrespective of whether William had actual authority to give consent. In the absence of actual authority, a warrantless search based on third-party consent will be upheld if it comes within the "apparent-authority" exception. *State v. Linde*, 876 A.2d 1115, 1125 n. 7 (R.I.2005). Under this rule, the Fourth Amendment is not violated when officers enter without a warrant when they reasonably believed that the person who consented to their entry had the authority to admit them.[21] *Illinois v. Rodriguez*,

---

**21.** The majority asserts that under *Illinois v. Rodriguez*, 497 U.S. 177, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990), the apparent-authority doctrine should be applied only when the police relied on a mistaken factual determination concerning an individual's authority to consent. Although the *Rodriquez* Court applied the doctrine in such a situation, I do not believe the Court required that police rely on a mistake of fact as a prerequisite to applying the doctrine; rather, the Court focused on the reasonableness of the police officers' belief.

497 U.S. 177, 186, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990). The standard for deciding the reasonableness of an officer's belief is an objective one: "[W]ould the facts available to the officer * * * 'warrant a man of reasonable caution in the belief' that the consenting party had authority over the premises?" *Id.* at 188, 110 S.Ct. 2793 (quoting *Terry v. Ohio,* 392 U.S. 1, 21–22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)).

Courts have found apparent authority when the consenting individuals asserted their authority to consent and then took some affirmative actions on the premises that appeared to confirm that authority. *See Iron Wing v. United States,* 34 F.3d 662, 665 (8th Cir.1994) (holding that there was apparent authority when the consenting individual told the police she was living at the house and her familiarity with the house corroborated her statement); *Commonwealth v. Hughes,* 575 Pa. 447, 836 A.2d 893, 901 (2003) (holding that there was apparent authority where the consenting individuals opened the front door of the apartment for the police officers). In contrast, courts have declined to hold that there was apparent authority when police officers were unaware of any facts that suggested the individual consenting had the right to consent to a search. *See Stoner v. California,* 376 U.S. 483, 489, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964) (holding that the police had no reason to believe that the defendant had authorized the hotel night clerk to permit the police to search his room); *Riordan v. Texas,* 905 S.W.2d 765, 772 (Tex.Ct.App.1995) (rejecting the prosecution's apparent-authority argument because the officer knew the consenting individual did not live on the premises, did not expect her to be there, had sparse conversation with her, initiated the search of the premises, and made no inquiry into her authority to consent).

In the present case, I believe that it is arguable that William had actual authority to consent to the search because he was residing in the Barkmeyer residence for an indefinite period and given that he had "joint access" to the bedroom where he found the rope. *See United States v. Matlock,* 415 U.S. 164, 171 n. 7, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974) ("The authority which justifies the third-party consent * * * rests * * * on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the coinhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.").

But, even if William did not have actual authority to consent to the detective's entry and seizure, I believe it was certainly reasonable for Det. Swierk to believe that he did. Viewing the facts of this case through the prism of the *Rodriguez* reasonable-police-officer standard, we must consider what Det. Swierk knew at the point he located and seized the rope from the closet in the master bedroom. It appears that the detective was aware that William was staying at defendant's home at the relevant time, and certainly with the knowledge and approval of his daughter. There is no question that he was not an overnight guest.

Also, William had initiated contact with Det. Swierk after he arrived from California, had inquired about the investigation, and had established himself as the principal contact person for the family. Detective Swierk previously had met with William, at the latter's request, and William had turned over several items taken either from the home or defendant's vehicle to the detective in an effort to assist in the criminal investigation. Furthermore, Wil-

liam informed the detective about the rope and requested that Det. Swierk come to the house to retrieve the item. Finally, when he entered the home, Det. Swierk walked directly by Jennifer, who was sitting in the living room. It is particularly noteworthy that Jennifer did not object to William's allowing the detective into her home and then into her bedroom. To me, that is a fact that impacted the detective's reasonable belief that William had authority to consent.

Based on these facts, I reach the inescapable conclusion that it was reasonable for Det. Swierk to believe that William was a coinhabitant of the Barkmeyer residence, even if temporarily, and that he had the authority to consent to the detective's entry into the home, his search of the bedroom closet, and his seizure of the rope. For these reasons, and although I respectfully disagree with the majority's reasoning, I concur in its holding that the hearing justice properly denied defendant's motion to suppress.

## II. Closure of the Courtroom

I also respectfully dissent from the rationale of the majority with respect to the issue of the partial closure of the courtroom. The majority has no hesitation in assigning error to the trial justice's order restricting attendance to specified individuals and excluding other "unnecessary personnel" from defendant's trial, and I agree. I depart from the majority's reasoning, however, regarding the effect of that error.

The trial justice's decision to partially close the courtroom may well have been based soundly upon medical reports and other documentation that he reviewed, and he may have considered the arguments of counsel. The problem is, however, that whatever process the trial justice engaged in was undertaken in chambers and was

not on the record. I agree with the majority that this was error. What dooms defendant's challenge, according to the majority, is defense counsel's failure to demonstrate that anyone actually was excluded from the courtroom, as well as his failure to suggest to the trial justice that his closure order could have been tailored more narrowly.

The majority reasons that the record fails to illuminate whether anyone actually was excluded from the courtroom. In my opinion, this is a classic harmless-error analysis and is flawed in light of our holding in *State v. Torres,* 844 A.2d 155, 162 (R.I.2004). The majority cites two decisions of this Court, *State v. Lerner,* 112 R.I. 62, 308 A.2d 324 (1973), and *State v. Fayerweather,* 540 A.2d 353 (R.I.1988), to support its proposition that the trial justice's error is not reversible based on a dearth of evidence of exclusion.

In *Lerner,* 112 R.I. at 91, 308 A.2d at 342, the trial justice denied the defendant's motion to conduct his trial in a larger courtroom. The defendant argued that this denial violated his right to a public trial as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution. *Id.* In denying the defendant's appeal on this issue, we said:

"No basis is established in the record that the size of the courtroom in any way deprived defendant of a fair trial. The trial justice pointed to factors which militated against a change of courtroom and in the sound exercise of his discretion denied this motion.

"While it is suggested that the public would be excluded from the trial, nothing in the record establishes that the public actually was excluded. * * * On the basis of the record and the briefs presented, we are unable to conclude that defendant was prejudiced in any way by the size of the courtroom." *Id.*

In *Lerner*, however, there is no indication whatsoever that the trial justice issued an order to close the courtroom or even that he was asked to do so—he simply declined the defendant's request to move the trial to a larger courtroom. Further, *Lerner* was decided well before *Waller v. Georgia*, 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984) and *Press–Enterprise Co. v. Superior Court of California*, 464 U.S. 501, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984), in which the United States Supreme Court clearly delineated rules for trial justices to abide by when considering courtroom closures.

In *Fayerweather*, 540 A.2d at 353–54, the defendant argued that the trial justice erroneously granted the prosecution's motion to close the courtroom during the testimony of a six-year-old sexual-abuse victim. Deciding against the defendant, this Court held that "[t]here is nothing to suggest that a significant number of individuals attended the trial or wished to attend or were unable to gain admittance to the courtroom when the six-year-old was about to testify." *Id.* at 354. Because of that, this Court held that "the defendant suffered no prejudice and the trial justice's error, if any, was harmless beyond a reasonable doubt." *Id.*

In other words, in *Fayerweather*, even though we determined that the trial justice's failure to conduct the hearing before restricting public access to the courtroom was constitutionally deficient, we pointed out that the record was devoid of evidence that anyone was prohibited from attending the proceeding, and, therefore, declared the error to be harmless. But, *Fayerweather* is singularly inapplicable here because when we decided *Torres*, some eighteen years later, we adopted and embraced the United States Supreme Court's holding that "violations of the Sixth Amendment's public-trial provision are not subject to a 'harmless error' analysis." *Torres*, 844 A.2d at 162 (citing *Arizona v. Fulminante*, 499 U.S. 279, 309, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991) and *Waller*, 467 U.S. at 49 n. 9, 104 S.Ct. 2210).

The majority also faults defendant for not specifying those individuals to whom the order would apply. However, there are two ways that a member of the public can be excluded from a trial—either by being asked to leave after he already has been seated, or by being barred from entering after the order takes effect. Even if defendant could have specified the people in the former category, he would have no awareness of those in the latter category.

The majority further faults defendant for not affirmatively suggesting less confining restrictions to the trial justice's partial closure order. In essence, the majority blames defendant for the trial justice's error because defendant was not more specific or aggressive. As authority for this conclusion, the majority cites a string of cases. *See Bell v. Jarvis*, 236 F.3d 149, 155–56 (4th Cir.2000); *Brown v. Kuhlmann*, 142 F.3d 529, 541 (2d Cir.1998); *Ayala v. Speckard*, 131 F.3d 62, 71 (2d Cir.1997).

It is significant that in each and every one of those cases, the trial justice had conducted a hearing on the closure motion in open court and he had made findings of fact to support his order. At that point, courts have reasoned that a defendant cannot sit idly by, but must make some suggestions about how the court's objectives to partially close the courtroom can be carried out in a more narrowly tailored fashion. But here, the order was fatally flawed from the beginning because there was no hearing, no findings based upon that hearing, and no record for us to review.

Errors by trial justices may be harmless or reversible.[22] Because a public trial is a right guaranteed to an accused by the Sixth Amendment to the United States Constitution and article 1, section 10, of the Rhode Island Constitution, we held in *Torres*, 844 A.2d at 162, that violations of these provisions are not subject to harmless error.

In my opinion, therefore, the trial justice's issuing an order to partially close the courtroom in this case, absent the constitutional safeguards set forth in the case law, was reversible error. I would, therefore, vacate the judgment of conviction and order a new trial for this defendant.

---

22. There is a body of law, however, that provides that an inadvertent or very brief closure of a courtroom is a trivial error not requiring reversal. *See, e.g., Peterson v. Williams*, 85 F.3d 39, 44 (2d Cir.1996) (holding that a brief and entirely inadvertent courtroom closure, when the testimony was videotaped and later repeated in open court, was sufficiently trivial that the defendant's Sixth–Amendment rights were not violated); *United States v. Al–Smadi*, 15 F.3d 153, 154–55 (10th Cir.1994) (holding that a brief and inadvertent closure that went "unnoticed by any of the trial participants" did not violate the defendant's Sixth–Amendment rights); *Snyder v. Coiner*, 510 F.2d 224, 230 (4th Cir.1975) (holding that a brief closure based on the sheriff's misinterpreting the judge's request to keep the courtroom quiet was "entirely too trivial to amount to a constitutional deprivation"). The record here, however, reveals that the closure was neither inadvertent nor brief.